UNITED STATES of America,
Appellee,

v.

Aaron GOMES, Defendant–Appellant.

Docket No. 04–1004–CR.

United States Court of Appeals,
Second Circuit.

Argued: Aug. 31, 2004.

Decided: Oct. 25, 2004.

Jeremiah Donovan, Old Saybrook, CT, for Defendant–Appellant.

Thomas V. Daily, Assistant United States Attorney, District of Connecticut (Kevin J. O'Connor, United States Attorney, and Jeffrey A. Meyer, Assistant United States Attorney, on the brief), for Appellee.

Before: VAN GRAAFEILAND, JACOBS, and POOLER, Circuit Judges.

JACOBS, Circuit Judge:

Aaron Gomes has been declared mentally incompetent to stand trial, but examining doctors at a government medical facility have determined that competency could be achieved by treatment with anti-psychotic drugs. After Gomes's repeated refusal to undergo the prescribed course of treatment, the United States District Court for the District of Connecticut (Droney, *J.*) granted a motion to authorize the Bureau of Prisons to medicate him involuntarily.

In *Sell v. United States*, 539 U.S. 166, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003), the Supreme Court held that the Government may involuntarily medicate a mentally ill defendant to render him competent for trial. This case, returning to us following a post-*Sell* remand, presents the first opportunity this Court has had to review a district court's application of the *Sell* factors. For the reasons that follow, we conclude that the district court did not err.

## BACKGROUND

Aaron Gomes was indicted October 27, 1998 on one count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). By virtue of (at least) three prior convictions for violent felonies or serious drug offenses, Gomes faces a mandatory minimum of fifteen years' imprisonment. *See id.* § 924(e).

In May 1999, defense counsel requested a psychiatric evaluation of his client, but Gomes refused to cooperate. In June 1999, the district court ordered on its own motion a psychiatric examination to assess Gomes's competency to stand trial. When Gomes again refused to cooperate, the district court ordered a 30–day commitment for evaluation. Gomes was placed in the custody of the U.S. Medical Center for Federal Prisoners in Springfield, Missouri ("USMC–Springfield").

At a competency hearing in May 2000, the court heard testimony from Dr. David Mrad, one of the psychologists who had examined Gomes at USMC–Springfield, that Gomes was delusional, suffered from a general "psychotic disorder," and lacked a "rational understanding" of the proceedings against him. The district court found that Gomes lacked the competence to be tried, and ordered him committed to the custody of the Attorney General for three months to determine whether there was a substantial possibility that he would attain such competency in the foreseeable future.

Gomes was returned to the custody of USMC–Springfield for further evaluation. His doctors there prescribed a course of anti-psychotic medication that they believed would help restore competency, but Gomes repeatedly refused the treatment. The Government eventually sought an order from the district court to authorize the Bureau of Prisons ("BOP") to medicate him involuntarily. After conducting a full hearing, the district court issued the order.

On appeal of that order, this Court affirmed, *see United States v. Gomes,* 289 F.3d 71 (2d Cir.2002) (hereinafter *Gomes I*), and Gomes petitioned the Supreme Court for a writ of certiorari. While Gomes's petition was pending, the Supreme Court issued *Sell v. United States,* 539 U.S. 166, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003), holding that, under specified circumstances, a defendant may be involuntarily medicated in order to render him competent for trial. Granting Gomes's petition for certiorari, the Supreme Court vacated and remanded to this Court for reconsideration in light of *Sell.* This Court remanded to the district court.

In July 2003, the district court ordered that Gomes be transferred back to USMC–Springfield for 30 days to re-evaluate his ability to stand trial and the prospect of his attaining competence. At the subsequent hearing, the court heard expert testimony from USMC–Springfield psychologist Dr. Mrad and from Dr. Robert Sarrazin, a psychiatrist. Both testified that Gomes has a delusional disorder of grandiose and persecutory type, and that there is a 70 percent chance that he could be rendered competent through treatment with anti-psychotic medication. In February 2003, the court issued an order, in light of *Sell,* permitting the BOP to medicate Gomes involuntarily. Gomes filed a timely notice of appeal and the district court granted his motion for a stay pending appeal. Gomes is currently in custody.

## DISCUSSION

In *Sell v. United States,* 539 U.S. 166, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003), the Supreme Court held that the Government may involuntarily medicate a mentally ill defendant to render him competent for trial if: [i] there are important governmen-

tal interests in trying the individual; [ii] the treatment will significantly further those interests; [iii] the treatment is necessary to further those interests, considering any less intrusive alternatives; and [iv] the treatment is medically appropriate. *See id.* at 180–81, 123 S.Ct. 2174.

■ The Supreme Court did not articulate a standard of proof to govern consideration of these factors. This Court in *Gomes I* read *Riggins v. Nevada,* 504 U.S. 127, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992), to suggest that the relevant findings must be supported by clear and convincing evidence. *See Gomes I,* 289 F.3d at 82. Although *Gomes I* was vacated and remanded for consideration in light of *Sell,* its analysis on this point remains sound. The Court in *Sell* also did not specify the standard of review that should be applied to a district court's analysis of these factors. Whether the Government's asserted interest is important is a legal question that is subject to *de novo* review. The district court's findings with respect to the other *Sell* factors are factual in nature and are therefore subject to review for clear error. *See Benjamin v. Fraser,* 343 F.3d 35, 43 (2d Cir.2003).

The *Sell* factors control when the sole purpose of forced chemical treatment is to render a defendant competent for trial; therefore, a threshold inquiry is whether the forced treatment is justified for other reasons, such as those "related to [the defendant's] dangerousness, or ... where the refusal to take drugs puts [the defendant's own] health gravely at risk." *Sell,* 539 U.S. at 182, 123 S.Ct. 2174. Drs. Mrad and Sarrazin testified that Gomes is not a danger in the prison population; there is no evidence that Gomes presents a danger to himself nor that he faces a serious health risk absent medical treatment. The *Sell* test thus applies.

**I**

■ *Sell* first directs us to consider whether "important governmental interests are at stake" in Gomes's prosecution. *Id.* at 180, 123 S.Ct. 2174. Generally, "[t]he Government's interest in bringing to trial an individual accused of a serious crime is important"; at the same time, however, certain circumstances "may lessen the importance of that interest." *Id.* For instance, if the incompetent defendant faces lengthy commitment to a mental institution, that consideration "affects, but does not totally undermine, the strength of the need for prosecution." *Id.*

Prior to *Sell,* this Court concluded in *Gomes I* that the governmental interest in trying Gomes is strong:

> In this case, we believe that the government has an essential interest in bringing Gomes to trial. Gomes faces trial for a serious felony—possessing a firearm as a felon. Both the seriousness of the crime and Gomes's perceived dangerousness to society are evident from the substantial sentence Gomes faces if convicted. Because he has committed at least three prior violent felonies or serious drug offenses, Gomes faces a possible statutory minimum of fifteen years' imprisonment.

289 F.3d at 86. Again, though *Gomes I* was vacated and remanded for further consideration, nothing in *Sell* undermines this persuasive reasoning.

Gomes emphasizes that he was charged only with illegal possession of a handgun, not use. But his possession is compounded by his three prior convictions for serious drug offenses. Under 18 U.S.C. § 924(e), an armed felon with three convictions for violent felonies or serious drug offenses is subject to an enhanced sentence regardless of whether the firearm was deployed; Congress evidently believed

when it enacted the statute that possession in the hands of an "armed career criminal" such as Gomes is a serious threat in itself. *Accord United States v. Dillard,* 214 F.3d 88, 94 (2d Cir.2000) ("The risk of violent use posed by a convicted felon's possession of firearms is significant.").

We then consider whether the potential for civil commitment abates the Government's interest in prosecuting Gomes. After oral argument, we requested supplemental briefing from the parties on whether the Government would lose the ability to pursue the present indictment if Gomes were civilly committed or if at some point, by some means, he achieves sufficient competence to assist in his defense. The parties agree that in either case, the Government could still proceed against Gomes on the present indictment. Nevertheless, as the Government points out, "it may be difficult or impossible to try a defendant who regains competence after years of commitment during which memories may fade and evidence may be lost." *Sell,* 539 U.S. at 180, 123 S.Ct. 2174. Gomes responds that because the district court conducted a suppression hearing at which the Government's crucial witnesses testified, that testimony would be admissible at trial if any of these witnesses forget, die, or become otherwise unavailable. *See* Fed.R.Evid. 804(a), (b)(1). It is not entirely clear, however, that testimony from the suppression hearing would be admissible at Gomes's trial. Rule 804(b)(1) requires, *inter alia,* that "the party resisting the offered testimony at a pending proceeding [have] had at a prior proceeding an interest of substantially similar intensity to prove (or disprove) the same side of a substantially similar issue." *United States v. Jackson,* 335 F.3d 170, 178 (2d Cir.2003) (quotation omitted). Because the primary issue at Gomes's suppression hearing was whether the vehicle stop that led to discovery of the firearm violated the Fourth Amendment, Gomes may have lacked the motive to cross-examine the Government's witnesses as to facts primarily relevant to his guilt or innocence. In any case, we need not consider how the potential for civil commitment impacts this case. There is little, if any, evidence on the record to suggest that Gomes would qualify for civil commitment. Drs. Mrad and Sarrazin both testified that Gomes is not a danger in the prison setting. And as the district court recognized, "the disorders diagnosed in this case relate specifically to the competency determination and not to [the] risk of [Gomes] harming other persons or property"; it is therefore relatively unlikely that Gomes would be civilly committed.

The prospect of civil commitment is insufficient to undermine the Government's interest in bringing Gomes to trial.

## II

◼ We must determine next whether the district court erred in finding that involuntary medication would significantly further the important governmental interest in trying Gomes. In doing so, we must consider whether the court properly found that the treatment is: [i] substantially likely to render Gomes competent to stand trial and [ii] substantially unlikely to have side effects that will interfere significantly with his ability to assist in his defense. *Sell,* 539 U.S. at 181, 123 S.Ct. 2174.

The district court chiefly relied on the testimony of Drs. Mrad and Sarrazin to find a substantial likelihood that Gomes's competency could be restored through chemical treatment. The doctors noted a "substantial probability" that anti-psychotic medication would render him competent. The court also cited the BOP's 70 percent success rate in restoring defendants to

competence through treatment (voluntary or not) with anti-psychotic medication. We are satisfied that the district court's findings on this score are not clearly erroneous.

We likewise believe the district court properly found that the potential side effects of medication are substantially unlikely to handicap Gomes in assisting in his own defense. Dr. Sarrazin testified that he would attempt to treat Gomes with "atypical" anti-psychotic drugs. According to Dr. Sarrazin, the atypical drugs would reduce or eliminate Gomes's delusions so that he can better communicate, and the side effects—sedation, dryness of the mouth, and such gastrointestinal problems as constipation and diarrhea—would likely subside within three to four days after treatment begins.*

Gomes, however, contends that forced medication will impair his ability to present the defense that he presently wants to mount, i.e., that he is the victim of a prosecutorial and judicial conspiracy. He wishes to argue at trial that the gun was planted on him as part of a police plot against a formidable and implacable foe, "a vociferously angry defendant"; but he worries that the medication will make him appear to be an implausible target for such a conspiracy. He believes that chemical treatment will make it "less likely that [he] will insist on pursuing his conspiracy theories at trial."

That defense may be, as defense counsel asserts, "as likely to succeed as any other defense that might be mounted." But Gomes's present choice of defense strategy cannot influence the analysis. Gomes has been found incompetent because of his mental illness and he cannot be tried

(whatever the defense) until that illness is treated. Standing trial now—with a certifiedly delusional defendant advancing a possibly delusional defense—is not an option in our system. Once his competence is restored, Gomes will be free to pursue a conspiracy defense at trial or to adopt another course.

### III

■ We consider next whether the district court erred in finding that forced medication is necessary to further the Government's interest in prosecuting Gomes, specifically, whether any "alternative, less intrusive treatments are [ ]likely to achieve substantially the same results." *Sell,* 539 U.S. at 181, 123 S.Ct. 2174. Drs. Mrad and Sarrazin testified that alternative forms of treatment (such as verbal therapy) would be ineffective, primarily because one of the delusions Gomes entertains is that he is sound. Dr. Mrad noted that verbal therapy is generally unsuccessful for patients, such as Gomes, who have a distorted perception of reality. The district court credited this testimony in finding that alternative means of treatment would be unlikely to restore Gomes's competency.

Gomes argues that because he has had no treatment of any kind during his time in custody, the district court's finding is "untested." But he provides no evidence as to the efficacy of any alternative therapy, let alone one that he would be willing to undergo. We are therefore satisfied that there was no clear error in the district court's finding.

Before authorizing involuntary medication, we must also "consider less intru-

---

* "Typical" anti-psychotic drugs can potentially produce more severe side effects, such as neuroleptic malignant syndrome (temperature disorder and muscle breakdown) and tardive dyskinesia (involuntary movement of the face and tongue). Dr. Sarrazin confirmed that there is a low risk of these side effects with atypical medication.

sive means for administering the drugs," such as "a court order to the defendant backed by the contempt power." *Sell,* 539 U.S. at 181, 123 S.Ct. 2174. Gomes has repeatedly refused all chemical treatment and has indicated that he will not cooperate under any circumstances. Since he seems to believe that the judiciary has enlisted in the conspiracy against him, a court order does not seem to be the inducement he is waiting for. In any event, Drs. Mrad and Sarrazin testified that Gomes would first be asked to take the medication voluntarily before it would be administered by force.

## IV

█ Finally, we must determine whether the district court properly found that "the administration of the drugs is medically appropriate" given Gomes's medical condition. *Id.* The district court again credited the testimony of Drs. Mrad and Sarrazin in finding that the proposed medical treatment is in Gomes's best interest. Dr. Sarrazin stated that Gomes's condition "is such that he needs . . . treatment [with] anti-psychotics. It is medically appropriate to treat a debilitating illness."

Gomes claims that the treatment is medically inappropriate because it will not be properly supervised after he is transferred from USMC–Springfield to prison. However, Dr. Sarrazin testified that the side effects of the medication subside once a patient has reached a stable dosage; by the time Gomes returns to prison, the only monitoring needed will be to ensure that he takes the medicine. Gomes has adduced no evidence that the course of treatment would be detrimental given his medical condition, and we cannot say that the district court clearly erred in concluding that the administration of drugs is medically appropriate.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.