**UNITED STATES of America**

v.

**Susan LINDAUER, a/k/a "Symbol Susan", Defendant.**

**No. S2 03 CR. 807(MBM).**

United States District Court,
S.D. New York.

Sept. 6, 2006.

Michael J. Garcia, Esq., United States Attorney for the Southern District of New York, Edward C. O'Callaghan, Esq., Assistant U.S. Attorney, New York City, for Plaintiff.

Sanford Talkin, Esq., Talkin, Muccigrosso & Roberts L.L.P., New York City, for Defendant.

## OPINION AND ORDER

MUKASEY, District Judge.

Susan Lindauer is charged in four counts with conspiring to act and acting as an unregistered agent of the government of Iraq, in particular the Iraq Intelligence Service ("IIS"), from October 1999 until February 2004, and engaging in various forbidden financial transactions with that government during that period, apparently in connection with her alleged role as agent of that government. At least a half dozen mental health professionals, including a psychologist and a psychiatrist retained by the defense, and several psychologists and psychiatrists employed, and one psychiatrist retained, by the government, have found her mentally incompetent to stand trial, due principally to delusions of grandiosity and paranoia that make her unable to assist meaningfully in her own defense and understand the nature of the proceedings she faces. Defendant, but not her lawyer, has refused to accept the diagnosis and has refused to take psychotropic drugs that government physicians wish to administer in aid of rendering her competent to stand trial. The government has moved pursuant to *Sell v. United States*, 539 U.S. 166, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003) for an order compelling administration of such drugs. Lindauer, through and with the approval of her lawyer, opposes the motion.

*Sell* is discussed at greater length below, but in summary it requires that in order to obtain such relief, the government show that important government interests are at stake in prosecuting the particular case at issue, that administration of psychotropic drugs is substantially likely to render the defendant competent to stand trial and substantially unlikely to have side effects that will interfere with her ability to assist in presenting a defense, that involuntary administration of such drugs is necessary to advance the government's interests because less drastic measures will not suffice, and that administration of such drugs is in defendant's best medical interest in light of her over-all medical condition. *See id.* at 180–82, 123 S.Ct. 2174. Our Court of Appeals has held that it is the government's burden to establish each of these criteria by clear and convincing evidence. *See United States v. Gomes*, 387 F.3d 157, 160 (2d Cir.2004).

Based on the evidence presented at a *Sell* hearing on May 4 and May 9, 2006, for the reasons explained below, the government has failed to carry this burden with respect to one, and possibly two, of these criteria—possibly as to the importance of the government's interest and certainly as to the likelihood that the proposed medication will succeed. Accordingly, the motion is denied.

## I.

### A. *The Indictment*

Count One of the indictment charges Lindauer with participating in a conspiracy with two other named defendants, Raed Noman Al–Anbuke and Wisam Noman Al–Anbuke, to act in the United States as agents of the government of Iraq without notification to the Attorney General, in violation of 18 U.S.C. § 951 (2000). The two defendants bearing the name Al–Anbuke are sons of a former Iraqi diplomat who have already pleaded guilty, been sentenced to time served, and left the United States, I believe for Iraq. Their charged conduct, as explained by the government in pretrial submissions, involved principally obtaining the names of expatriate Iraqis in this country who were acting against the interest of the Saddam Hussein regime, and turning them over to IIS. It bears emphasis here that it was never the government's theory that Lindauer participated in such conduct, or indeed that she even knew the Al–Anbuke brothers. Rather, she and they were charged together only because both allegedly conspired with IIS.

Although it is concededly a risky business to judge the thrust of underlying charged conduct from the overt acts set forth in an indictment, the acts attributed to Lindauer in the indictment are the following: meetings in 1999 and October 2001 with IIS officers, at the latter of which she accepted an unspecified task; acceptance in January 2002 of $232.77 and on two dates in February of $311.10 and $270.00, respectively, for travel, lodging and meal expenses; travel from February 23 to March 8, 2002, to Iraq, via Jordan, and meetings there in venues that included the Al Rashid Hotel in Baghdad, where she accepted $5,000; a meeting in Manhattan where she accepted $200.00 for travel, lodging and meal expenses; delivery on January 8, 2003, to the home of an unspec-

ified government official, of a letter in which she conveyed "her established access to, and contacts with, members of the Saddam Hussein regime, in an unsuccessful attempt to influence United States foreign policy." (Indictment ¶ 3n) Thereafter, she is alleged to have engaged in a series of acts involving an undercover FBI agent posing as a member of the Libyan intelligence service, all apparently directed at supporting what are referred to as "resistance groups in post-war Iraq" (Indictment ¶ 3o), by which I conclude is meant groups resisting the United States and its allies and the post-war Iraqi government.

Lindauer has been reported in numerous news articles to be a cousin, to a remote degree of consanguinity, of Andrew Card, a former White House chief of staff in the current administration. *E.g.*, David Samuels, *Susan Lindauer's Mission to Baghdad*, New York Times Magazine, Aug. 29, 2004, at 25. Although Lindauer is reported in the cited article to have contacted Card during her period of contact with Iraqi officials, it is uncertain whether he is the unspecified "government official" referred to in the indictment.

The substantive counts of the indictment charge defendant with acting as an unregistered agent of the Iraqi government in violation of 18 U.S.C. § 951 (Count Two); accepting about $10,000 from IIS as payment for "various services and activities," including her trip to Baghdad in violation of 18 U.S.C. § 2332d (Count Five); and engaging in financial transactions with the government of Iraq in relation to her trip to Iraq in violation of 50 U.S.C. § 1701 *et seq.* (Count Six).

From these charges, it appears that the high-water mark of defendant's efforts to act as an unregistered agent for the Iraqi government was her delivery of a letter in January 2003 to the home of an unspeci-

fied government official, in what is described even in the indictment as "an unsuccessful effort to influence United States foreign policy." (Indictment ¶ 3n)

The maximum sentence on the conspiracy count is five years; the maximum sentence on each of the substantive counts is ten years.

### B. Defendant's Mental Status In Relation to This Case

#### 1. Procedural Background

At the instance of her attorney, Lindauer was examined initially in January 2005 by Sanford L. Drob, Ph.D., a psychologist. Thereafter, in May and July 2005, she was examined by Dr. Stuart B. Kleinman, a government-retained psychiatrist. In September 2005, she agreed to go voluntarily to the Federal Medical Center, a Bureau of Prisons facility in Carswell, Texas, to undergo examination and, if necessary, treatment. There, she was examined and/or her records and other documentation reviewed by at least two psychologists and two psychiatrists on the staff of that facility. In addition, her records and other documentation were reviewed by Dr. Robert L. Goldstein, a psychiatrist retained by the defense. Whatever their differences in diagnosis, or as to the efficacy of forced medication, all agreed that Lindauer suffers grandiose and paranoid delusions.

At the *Sell* hearing, the court heard testimony from Dr. Collin J. Vas, a staff psychiatrist at the Carswell, Texas facility where defendant was evaluated; Dr. Stuart B. Kleinman, a psychiatrist retained by the government; and Dr. Robert L. Goldstein, a psychiatrist retained by defendant. In addition, eight reports from mental health professionals were received in evidence at the hearing pursuant to stipulation, including reports by the witnesses who testified. These were the following: (i) Report of Sanford L. Drob, Ph.D., February 28, 2005; (ii) Report of Stuart B. Kleinman, M.D., September 13, 2005; (iii) Report of James A. Shadduck, Ph.D., (reviewed by Robert E. Gregg, Ph.D.) December 13, 2005; (iv) Report of Collin J. Vas, December 19, 2005; (v) Report of James A. Shadduck, Ph.D., (reviewed by another psychologist whose signature was indecipherable), December 28, 2005; (vi) Report of William M. Pederson, M.D., December 29, 2005 (supplemented by Letter of William M. Pederson, M.D. to the Court, January 19, 2006); (vii) Report of Robert Lloyd Goldstein, M.D., March 20, 2006; (viii) Report of Stuart B. Kleinman, M.D., April 7, 2006.[1]

Of the witnesses who testified at the hearing, the parties plainly placed principal reliance on the two outside retained psychiatrists—the government on Dr. Kleinman and defendant on Dr. Goldstein. Both are well credentialed and highly accomplished. (*Compare* 5/4/06 Tr. 53–55 *with* 5/9/06 Tr. 3–4)

Post-hearing submissions concluded on June 13, 2006.

#### 2. Diagnoses

Most of the reports referred to above, and some of the testimony at the hearing, dealt with the defendant's diagnosis, using categories from a publication known as the *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition*, or DSM–IV–TR. There was disagreement as to the diagnosis but, so far as I can discern, no material controversy. Thus,

---

1. Regrettably, these exhibits were not marked separately for identification, and accordingly will be referred to herein by the name of the reporting expert and the date of the report. In addition, various exhibits that were marked were received in evidence during the witnesses' testimony and will be referred to by their exhibit designations.

those arrayed on the government side agreed on a diagnosis of psychotic disorder, not otherwise specified (*e.g.*, 5/4/06 Tr. 9–10), whereas Dr. Robert Goldstein, defendant's retained psychiatrist, offered a diagnosis of delusional disorder, mixed type (5/9/06 Tr. 6; Goldstein Report 3/20/06, p. 2). A psychologist at Carswell wrote that defendant's "inability to fully acknowledge and discuss her current symptoms of mental illness limits the accuracy with which she can currently be diagnosed." (Shadduck Report 12/13/05 at 4) However, the focus of the hearing, and of the court's concern, was rather on the symptoms that make defendant incompetent to stand trial, and to what degree those symptoms are amenable to treatment by forced psychotropic medication. (*See* 5/4/06 Tr. 35) ("[T]he name of the disorder is important, but the symptoms are what we're treating.") As to the symptoms that make defendant incompetent to stand trial, there was no disagreement, and no testimony suggesting that the label attached to the syndrome of which they may be a part matters at all in determining whether they will yield to medication, forced or otherwise.

Dr. Kleinman, the government's retained psychiatrist, testified to three groups of symptoms that led him to his diagnosis of psychotic disorder not otherwise specified: (a) hallucinations, defined as distorted sensory perceptions, of three types: auditory, visual and tactile; (b) delusions, defined as false fixed beliefs, of two types: grandiose and persecutory; and (c) mood disturbances, hypomanic or manic. (5/4/06 Tr. 59) However, as he explained, it is only the delusions—false fixed beliefs—that interfere significantly with defendant's ability to assist in her own defense; it is not the hallucinations or the mood disorder. (5/4/06 Tr. 66)

Here, it may be useful to examine at least briefly the delusions the doctors perceived so that their effect on defendant's ability to assist her defense can be appreciated. Dr. Kleinman describes a history of psychotic phenomena and episodes going back to defendant's childhood, possibly as early as the age of 7, including purported gifts of prophecy and spiritual visitations (Kleinman 9/13/05 Report at 8–11; 5/4/06 Tr. at 93) as well as mood disturbance (*id.* at 12–14) and three varieties of hallucinations (Kleinman 9/13/05 Report at 14–21). He then cites five examples of Lindauer's own writings as reflecting delusions of grandiosity: she suggests that she reported 11 bombings before they occurred, suggests that she speaks with divine inspiration, places herself at the center of events in the Middle East, and declares herself to be an angel. Further, he cites seven of her writings as evidence of paranoid delusions: that she was under government surveillance from hidden cameras inside her apartment; that the CIA and FBI were after her because of difficulties in this country's relationship with Syria; that the Egyptian government had made an attempt on her life; that the intelligence community was subverting her, including by blowing up the modem on her computer; that men next door had videotaped her on instructions of President Clinton; and that other threats and surveillance had been carried out against her (*id.* at 26–32). As a further example of both grandiosity and paranoia, he cites evidence that Lindauer has believed that objectively neutral environmental stimuli—such as lights going on or off, or a statement by a radio announcer—refer specifically to her (*id.* at 32–33).

Although Dr. Kleinman testified at the hearing that he usually likes to conduct personal interviews of people whose mental state is at issue in legal proceedings, he added that he is aware that such people

are motivated to either exaggerate or minimize symptoms, and so he relied on what he called "collateral data," which I take to mean journals and correspondence and other pre-existing statements by the subject that were made before there was any intent to influence the outcome of a legal proceeding. (5/4/06 Tr. 61) His initial report relied almost exclusively on such data.

Dr. Drob, the defense psychologist, based his conclusions solely on interviews with Lindauer, and reported only grandiose delusions, although he did report her claim that the government fabricated documents in connection with the current case. (Drob Report 2/28/05 at 7) He noted that defendant is adamant that she is in fact "an important government operative and that all her actions were in fact sanctioned by the intelligence branches of the United States government." (*Id.* at 5) She was, she claimed, a "back door channel between the U.S. and Iraq." (*Id.* at 6) He said that she insisted also she is owed and was cheated out of millions of dollars for negotiating with Libya, apparently to secure reparations in connection with the 1988 bombing of Pan Am flight 103 over Lockerbie, Scotland. (*Id.* at 5, 6) Although Dr. Drob was resolutely agnostic even as to claims by Lindauer about her involvement in the Lockerbie negotiations, her role in getting weapons inspectors into Iraq, and her involvement in getting President Clinton to prevent a nuclear terrorist act in the United States in 1995, characterizing such claims only as "extremely unlikely" (*id.* at 13), he did conclude that "when Ms. Lindauer begins to speak about her psychic powers it becomes eminently clear that she is delusional, and that the grandiose claims she makes about her participation in government affairs (although they may contain kernels of truth) are in all likelihood largely the product of her own psychotically disturbed imagination." (*Id.* at 14) He dismissed her claim that she had prophe-

sies about the Iraq war when she was a little girl, and knew days in advance of every specific target in Iraq and every assassination, as "delusional on its face." (*Id.*)

Dr. Goldstein, the defense psychiatrist, was somewhat less tentative, dismissing as "classic examples of the grandiose variety" her claims that she was "a preeminent government operative who was not sufficiently appreciated" and had contact with high-level government figures, and was possessed of psychic powers. (Goldstein Report 5/20/06 at 3) He reported also that "many of Ms. Lindauer's delusions are classic examples of the persecutory type". (*Id.*)

Dr. Drob's report explained that defendant's delusions interfere in two ways with her ability to assist counsel in her defense. First, because her delusions relate at least in part to the crime with which she is charged, they generate endless and perforce futile requests that her lawyer contact witnesses who she claims would support her description of the underlying events, and otherwise follow leads that exist only in her imagination. Second, her delusions make her resistant to the idea of pursuing a defense based on mental illness. (Drob Report 2/28/05 at 14–15)

Dr. Kleinman teased out in somewhat greater detail the way in which defendant's delusions interfere with her ability both to understand the case and to assist in her own defense. He pointed out that her assessment of the evidence and of the likelihood she will prevail at trial is based on her own view of reality, including that she was a Defense Intelligence Agency and Central Intelligence Agency "asset"; that she has gathered witnesses, including people from outside the United States, to testify to her value as an intelligence and anti-terrorism "asset"; that jurors are

more likely to think negatively of the government than of her if they see evidence that she accepted payment from Iraqi representatives; and that the government may avoid confronting her for fear of what she might disclose. (Kleinman Report 9/13/05 at 28–43) He pointed out also that her view of plea negotiations is influenced by her delusions insofar as she believes the government will withdraw the charges against her when prosecutors realize those charges are based on "bad information" and in order to avoid embarrassing disclosures she could make (*id.* at 44–45)

All of the mental health professionals who treated the subject agreed that defendant has resisted the idea that she suffers from any mental illness. Thus, Dr. Kleinman noted her insistence "that she does not suffer from mental illness, and that she categorically rejects using a defense based on" such illness (*id.* at 46); Dr. Drob stated that defendant "denies that she suffers from or has any history of mental illness" (Drob Report 2/28/05 at 4). The psychologists and psychiatrists at Carswell said that although defendant cooperated initially, she became angry and uncooperative when it was suggested that she was mentally ill. (*See* Shadduck Report 12/13/05 at 3; Pederson Report 12/29/05 at 3) Dr. Goldstein reported that such denial is characteristic of delusional patients. (Goldstein Report 3/20/06 at 5) This presents obvious obstacles to enlisting her assistance in framing a defense based on her mental condition.

Although defendant denies she is mentally ill, she is plainly aware of what others think, and so, as Dr. Kleinman noted, she "is disposed to dissimulate, i.e., minimize the presence and extent of her psychiatric difficulties, especially to mental health professionals—whom she distrusts and generally dislikes." (Kleinman Report 12/13/05 at 8) She acknowledged to him that if she testifies at her trial she will have to avoid touching on such subjects as her psychic powers, but "also noted that when (metaphorically) attacked by others she has spontaneously uttered prophecies." (*Id.* at 46)

There appears to be no dispute that defendant's delusions are of long duration. As noted, Dr. Kleinman found in his initial report that her writings suggest they go back to childhood, perhaps as early as age 7. (Kleinman Report 9/13/05 at 8–11; 5/4/06 Tr. at 93; see *supra* at 9) Dr. Shadduck, a psychologist at the Carswell facility, relying principally on interviews with defendant and the reports of Dr. Drob and Dr. Kleinman, concluded that "Ms. Lindauer appears to have developed increasingly severe symptoms of mental illness over the past several years." (Shadduck Report 12/13/05 at 1, 5)

It appears from Dr. Kleinman's initial report that even lay people can perceive that Lindauer is not mentally stable. A neighbor reported that Lindauer seemed "mildly schizophrenic." (Kleinman Report 9/13/05 at 35) However, the uniform view of those who addressed the subject of dangerousness was that whatever may be her mental condition otherwise, Ms. Lindauer is not a danger either to herself or to others. (*See* Pederson Report 12/29/05 at 6, reporting "*no evidence* of dangerousness" (emphasis in original); Shadduck Report 12/13/05 at 4; 5/4/06 Tr. 39)

### C. *Proposed Medication*

As noted, the dispute here concerns whether, having refused voluntary medication, defendant should be forced to take medication so as to render her competent to stand trial. That decision turns on whether the requirements of *Sell v. United States, supra,* have been met. Before any discussion of the evidence in this record relating to the issue of forced medication,

it would be useful to review in some detail the requirements of *Sell* and *Gomes, supra.*

### 1. *Legal Prerequisites to Forced Medication*

As noted, *Sell* establishes a four-part test for determining whether a defendant may be forced to take antipsychotic medication. "First, a court must find that *important* governmental interests are at stake." *Sell*, 539 U.S. at 180, 123 S.Ct. 2174 (emphasis in original). The Court found that prosecution of a defendant charged with a serious crime is such an interest. *Id.* However, *Sell* admonishes courts to "consider the facts of the individual case in evaluating the Government's interest in prosecution. Special circumstances may lessen the importance of that interest." *Id.* As an "example" of such a circumstance, the Court hypothesized a defendant whose refusal to take drugs voluntarily "may mean lengthy confinement in an institution for the mentally ill—and that would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime." *Id.* Of course, that is not the case here, where Lindauer has been found not to present a danger either to herself or to others (*see supra* at 564) and would not be so confined. But again, the hypothetical defendant discussed in *Sell* is only an example of "special circumstances"; by definition, an example does not define the universe of "special circumstances."

"Second, the court must conclude that involuntary medication will *significantly further* those concomitant ... interests." *Id.* at 181, 123 S.Ct. 2174 (emphasis in original). This requires a finding "that administration of the drugs is substantially likely to render the defendant competent to stand trial. At the same time, it must find that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." *Id.* No further explanation is provided or example offered of what might constitute "substantial" likelihood of success, "substantial" unlikelihood of adverse results, or "significant" interference with conduct of a trial defense.

"Third, the court must conclude that involuntary medication is *necessary* to further those interests. The court must find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results." *Id.* (emphasis in original). The court here is directed to "consider less intrusive means for administering the drugs, *e.g.,* a court order to the defendant backed by the contempt power, before considering more intrusive methods." *Id.*

"Fourth, ... the court must conclude that administration of the drugs is *medically appropriate, i.e.,* in the patient's best medical interest in light of his medical condition." *Id.* Here, the Court suggests consideration of the type of drug to be used and its projected side effects and level of success. *Id.*

Consideration of the factors relating to this fourth element may differ from the consideration necessary to resolve the second element, which also involves weighing likelihood of restoring competence against likelihood of adverse side effects, in that the second element focuses on favorable and unfavorable outcomes only insofar as they affect a trial, whereas the fourth element focuses on the defendant's medical well-being in the large.

The defendant in *Sell,* a one-time practicing dentist who had been treated, apparently successfully, with antipsychotic drugs before he became ensnared in the case that bears his name, 539 U.S. at 169, 123

S.Ct. 2174, was charged with submitting fictitious insurance claims for payment, and money laundering. *Id.* at 170, 123 S.Ct. 2174.

*Sell* did not prescribe the standard the government must meet in establishing each of these four elements. That gap is filled by *United States v. Gomes,* 387 F.3d 157 (2d Cir.2004), where our Court of Appeals endorsed a requirement that the government prove its case by clear and convincing evidence. *See id.* at 160.

*Gomes* also fills a couple of other gaps in *Sell,* albeit with much less explicit direction. In *Gomes,* it appears that the only witnesses were mental health professionals employed at the facility where the government proposed to treat the defendant, and they projected "a 70 percent chance that he could be rendered competent through treatment with anti-psychotic medication." *Id.* at 158. It is not clear whether that projection was particular to the defendant in *Gomes* because later in the opinion the Court found "not clearly erroneous" the District Court's reliance in part on "the BOP's [Bureau of Prisons'] 70 percent success rate in restoring defendants to competence through treatment (voluntary or not) with anti-psychotic medication." *Id.* at 161–62.

Coincidentally, the defendant in *Gomes* was reported to be suffering from the same delusions that afflict Lindauer: "delusional disorder of grandiose and persecutory type." *Id.* at 159. However, as noted, it appears that the only mental health professionals to present evidence in *Gomes* were a psychologist and a psychiatrist employed by the government; certainly, there was no mention in *Gomes* of any contrary testimony as to the amenability of such delusions to treatment of any kind, forced or otherwise. Because the case before this court must be decided on the record before this court, I draw no conclu-sions whatever from the apparent conclusion in *Gomes* that such delusions can be treated with whatever medication was proposed in that case. The only possible lesson I can draw from this portion of *Gomes* is that if one could project, based on clear and convincing evidence, a 70 percent likelihood of success in treating Lindauer, that would be sufficient.

The *Gomes* Court also analyzed the strength of the government's interest in bringing the defendant to trial as follows:

> Gomes faces trial for a serious felony—possessing a firearm as a felon. Both the seriousness of the crime and Gomes's perceived dangerousness to society are evident from the substantial sentence Gomes faces if convicted. Because he has committed at least three prior felonies or serious drug offenses, Gomes faces a possible statutory minimum of fifteen years' imprisonment.

*Id.* at 160.

For all the Supreme Court's focus in *Sell* on standards for coercing antipsychotic medication, the Court does acknowledge the principle, arising from the Court's own precedents, "that an individual has a constitutionally protected liberty 'interest in avoiding involuntary administration of antipsychotic drugs'—an interest that only an 'essential' or 'overriding' state interest might overcome." *Sell,* 539 U.S. at 178–79, 123 S.Ct. 2174, (quoting *Riggins v. Nevada,* 504 U.S. 127, 134, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992)). Such an essential or overriding interest was found, for example, in *Washington v. Harper,* 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990), where the Court permitted forcible administration of drugs "to inmates who are ... gravely disabled or represent a significant danger to themselves or others." 539 U.S. at 226, 123 S.Ct. 2297. But when such interests are absent, as they are here, certain questions present them-

selves, and the *Sell* Court made it plain that this court must keep them in mind:

> Why is it medically appropriate forcibly to administer antipsychotic drugs to an individual who (1) is *not* dangerous *and* (2) is competent to make up his own mind about treatment? Can bringing such an individual to trial *alone* justify in whole (or at least in significant part) administration of a drug that may have adverse side effects, including side effects that may to some extent impair a defense at trial? We consequently believe that a court asked to approve forced administration of drugs for purposes of rendering a defendant competent to stand trial, should ordinarily determine whether the Government seeks, or has first sought, permission for forced administration of drugs on these other *Harper*-type grounds; and, if not, why not.

*Id.* at 183, 123 S.Ct. 2174 (emphasis in original}).

Although the Court's discussion of a defendant's interest in avoiding forced psychotropic medication seems at times curiously anodyne, I think it is not inappropriate to recall in plain terms what the government seeks to do here, which necessarily involves physically restraining defendant so that she can be injected with mind-altering drugs. There was a time when what might be viewed as an even lesser invasion of a defendant's person—pumping his stomach to retrieve evidence—was said to "shock[ ] the conscience" and invite comparison with "the rack and the screw". *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952). The Supreme Court's rhetoric seems to have toned down mightily since then, but the jurisprudential principles remain the same.

### 2. *Evidence Bearing on Disputed Issue of Forced Medication*

All the mental health professionals at the Carswell facility endorsed in their reports the idea of prescribing antipsychotic medication for defendant. Indeed, even Drs. Shadduck and Greg, who hold Ph.D. degrees and accordingly are not, so far as I am aware, authorized to prescribe medication, nonetheless opined that "[a]ntipsychotic medications are the best treatment for symptoms of psychosis" (Shadduck Reports 12/13/05, 12/28/05 at 5) (*see* Vas Report 12/19/05 at 2; Letter of William M. Pederson, M.D. to the Court, Jan. 19, 2006, at 1)

Dr. Vas submitted the above-referenced two-page report, in which he concluded that it is medically necessary to treat defendant with antipsychotic medications, that they are "substantially likely" to render her competent, and that the side effects listed in his letter are rare and can be dealt with through "treatment strategies," and that in any event defendant does not to his knowledge suffer from any medical condition which would place her at substantial risk of developing any severe side effects.

Dr. Vas also testified at the hearing, and did so with the same bland assurance and utter lack of substantiation. He stated in conclusory form his professional belief that "antipsychotics are medically necessary and appropriate and that, although there is a risk of various side effects, the risk of the side effects are rather rare and fairly easily managed" (5/4/06 Tr. 24), and specifically as to defendant, answered in the affirmative to the question, "[i]n your opinion, is involuntary administration administration of antipsychotic medication medically appropriate to treat Ms. Lindauer for her mental condition?" (*Id.* at 28) He recommended what are referred to as second generation or atypical antipsychotic

medications that "are much more easily tolerated by patients, and we have some evidence that they have a less deleterious effect on cognition and help people think more rationally." (*Id.* at 23)

In the same broad fashion, he testified to experience with "people that . . . might complain of a side effect, and we try to alleviate side effects as much as we can and try to meet the treatment goals at the same time." (*Id.* at 25)

Similarly, and without elaboration, he testified that it was "extremely likely" that defendant would respond positively to anti-psychotic medication, and added that "[t]here have been a few studies done that have been published in the literature which would indicate a restoration to competency that is above 80 percent, anywhere from 80 to 95 percent and that has included patients from various diagnostic categories and their response to particularly antipsychotic treatment." (*Id.* at 29)

The government appears to have placed principal reliance on the testimony of its retained psychiatrist, Dr. Kleinman. He submitted an extensive initial report, cited above, that focused entirely on the diagnosis of defendant's condition. However, he submitted a later report that discussed treatment, and testified as well on the issue of forced antipsychotic medication.

His second report described why he prefers his diagnosis to that of Dr. Goldstein, but stated also that even if defendant is diagnosed as suffering from delusional disorder, "second generation, i.e., 'atypical', antipsychotic medication would reasonably likely—safely—help her." (Kleinman 4/7/06 Report at 10) Although the report supports that conclusion by quoting four studies that are optimistic as to the potential effectiveness of second generation antipsychotic medication in treating delusional disorder, all are anecdotal, which is to say none report on controlled studies. The

most optimistic, dated in 1995, reports an overview of the literature that suggests "80.8% of patients show total or partial recovery" (*id.* at 15), but that conclusion is hemmed in with qualifications, as follows:

> The authors are well aware that the outcome of this delusional disorder treatment overview is tentative. The existing literature has been investigated thoroughly, but its quality is extremely diverse, nomenclature is highly variable, and extended-case series are rare. The simplest details are often missing, such as dosage schedules, side effects, duration of drug use, etc., as well as reasons for choosing or changing drugs. Duration of follow-up is extraordinarily variable.

> Another confounding factor in looking at outcome results with different treatments is that pimozide has generally become the first-choice treatment in recent years. Therefore, other neuroleptics tend to be employed in somewhat older studies. This may make their direct comparison even less reliable than otherwise.

(*Id.*)

At the hearing, Dr. Kleinman came bearing a later report, published in February 2006, that reviewed the literature dating back to 1994 dealing with treatment of delusional disorder. (5/4/06 Tr. 79; GX 2) According to Dr. Kleinman, the new report concludes that the literature indicates "an effectiveness *overall* of various types of antipsychotic medication to be approaching 90 percent, in the high 80 percent." (*Id.* at 80) (emphasis added) The word "overall" here is significant, because Dr. Kleinman testified further as follows:

> Q. And with respect to persecutory and grandiose types of delusion [the two types with which defendant is afflicted],

what are the results as reported in the article?

A. Well, there is a total of 15 reported cases of persecutory delusions and there are a little bit more than 50 percent, eight [of] fifteen, are reported to be improved. None are reported to be recovered entirely, and there were no patients specifically with grandiose delusions.

*Id.* at 81

Moreover, Dr. Kleinman acknowledged a substantial ambiguity even in the "overall" figure, when he noted that the report showed elsewhere that a "positive response to medication treatment occurred in nearly 50 percent." (*Id.* at 81) He speculated that the apparent contradiction between the 50 percent and 90 percent figures could have occurred because at one point recovered and improved patients had been lumped together to generate the 90 percent statistic, but the author did not explain what was meant by "positive response" in nearly 50 percent of the cases. Dr. Kleinman conceded that this explanation was "not an entirely satisfactory one." (*Id.*) He offered for guidance also an article describing a single success in treating delusional disorder with Risperidone (GX 3), a second generation or atypical antipsychotic medication (5/4/06 Tr. at 83–84). However, the last sentence of the conclusion in that article reads as follows: "A controlled clinical trial of Risperidone in the treatment of patients with delusional disorder is warranted." (*Id.* at 85)

Dr. Kleinman explained the absence of evidence from controlled clinical studies by pointing out that delusional disorders are generally rarer than schizophrenic disorders, and accordingly it is difficult to obtain data with respect to delusional disorders and resources are directed more at the schizophrenic disorders. (*Id.* at 86) Later, he agreed that controlled studies are a "more desirable source of data for making treatment decisions." (*Id.* at 90) Despite the absence of controlled studies, and the "critical eye" with which case studies must be approached, he answered "Yes" to inquiries as to whether "involuntary administration of antipsychotic medication [is] medically appropriate to treat Ms. Lindauer's symptoms" and whether such treatment would "improve Ms. Lindauer's chances to be restored to mental competency to stand trial." (*Id.* at 87)

That was as strong an endorsement as he gave to involuntary medication. It bears mention here that initially, when he was not responding to leading questions, he testified simply that "there is only one type of treatment that holds any promise of diminishing ... the psychotic disorder not otherwise specified and that is antipsychotic medicine." (5/4/06 Tr. 63) That testimony says nothing about the likelihood that such treatment would succeed, but only that it is the sole treatment that could succeed in treating what he characterized as "a condition very much worthy of treatment." (*Id.* at 89)

Dr. Goldstein, defendant's retained psychiatrist, explained his preference for the diagnosis of delusional disorder, mixed type over psychotic disorder not otherwise specified (5/9/06 Tr. 6, 32–33), but readily noted that from the standpoint of treatment, the two defined "a distinction without a difference." (*Id.* at 28)

He reviewed the weaknesses of the paper Dr. Kleinman had brought to the hearing, GX 2, including not only that there were no controlled studies but also that,

there aren't many articles where someone says I treated six patients with this illness and none of them got better. Those kind of papers are generally not published. So there's a kind of skewing of the literature towards only writing

about things where you have a favorable outcome. (5/9/06 Tr. at 14; *see generally* id. at 13–16) Dr. Goldstein himself is working on an article about the *Sell* case and the issue of forced medication, in which he will take the position that some conditions are responsive to forced medication, but that delusional disorder is not among them. (*Id.* at 16)

Drs. Kleinman and Goldstein differed as well on the likelihood of undesirable secondary or side effects from forced administration of psychotropic drugs, starting with a paranoid patient's likely response if the drugs do not abate paranoia. Dr. Kleinman spoke principally of the likely effect of unsuccessful treatment on defendant's relationship with her lawyer, and said it was by no means certain that relationship would deteriorate because the relationship continued intact at the time of the hearing (5/4/06 Tr. at 68), although he conceded that an "extreme" reaction would be for her to "become very angry at him and reject him." Dr. Goldstein, on the other hand, testified to "a general consensus that compelling a paranoid delusional patient to undergo any coerced medication or other forms of treatment will have a high likelihood of intensifying their delusions, their agitation, their mistrust, their feelings of being persecuted and attempts to harm them and so forth." (5/9/06 Tr. at 17) In particular, he said, "it would have a highly adverse impact [on defendant's ability to function within the criminal justice system] because she'd be much more paranoid, so whatever distrust, and I'm sure there is some already, she has of the system and her lawyers and perhaps the judge, as well, would be intensified to the point where her cooperation and her level of ability to participate in the proceedings would be greatly compromised, I think." (*Id.* at 17) He said that conclusion is "just a matter of common sense that sometimes is exercised by doctors with clinical experience who know that a paranoid patient who is forced to do things that they view as particularly harmful to themselves are only going to get worse." (*Id.* at 43)

As to physical side effects, Dr. Kleinman agreed that certain of such side effects were possible, but emphasized that monitoring and screening of patients could mitigate or prevent the onset of such symptoms (5/4/06 Tr. 71–73, 92), although he agreed that a physician charged with monitoring a large number of patients would have a harder time monitoring each patient effectively (*id.* at 92). Dr. Goldstein relied on a pharmacology text (DX D) to project various percentages of physical side effects, principally including EPS, or extrapyramidal syndrome, which encompasses various degrees of muscular disorder and pseudo-Parkinsonism, with tremors, rigidity, and other involuntary muscular phenomena. (5/9/06 Tr. at 21) Such phenomena became more likely as the dosage increased, reaching 25 percent for Risperidone at a 16 mg level (DX D), which he said is considered a high incidence. (5/9/06 Tr. at 22; *see also* DX C) He testified that the recorded incidence of neurologic malignant syndrome, or NMS, in patients taking these medications is 2 percent, with 20 percent mortality in patients suffering NMS, a death rate of 4 per 1,000. (4/9/06 Tr. 24)

As to defendant's own experience with medication, she reported having been treated in the past for mood disorder with Depakote, which is not an antipsychotic but rather a mood stabilizer. (5/4/06 Tr. 64) The government has argued that defendant was treated successfully in the past with olanzapine for hypomanic or manic symptoms, which are among the symptoms of what Dr. Kleinman has diagnosed as psychotic disorder not otherwise

specified, and therefore that she has already had a successful experience with an antipsychotic drug. (Letter of Edward C. O'Callaghan, Esq. to the Court, June 2, 2006, at 1) However, those symptoms are not the ones that render her incompetent to stand trial, and that medication has not been suggested by anyone as a treatment for the delusional symptoms that do render her incompetent.

## II.

I think there is no dispute here that the government has presented clear and convincing evidence with respect to the third element under *Sell*—that means other than forced medication will not suffice to treat Lindauer, who rejects the very notion that she needs treatment and who has refused to take medication. Notwithstanding an attachment to defense counsel's March 27, 2006 submission wherein defendant offers to take medication on condition, *inter alia*, that she be released on her own recognizance, that the court appoint its own expert, in Maryland, who is to be "agreeable to me and to my attorney", and that the defendant will nominate her own candidate whose office location is convenient for commuting purposes subject to the court's approval. (Letter of Sanford Talkin, Esq. to the Court, March 27, 2006, Ex. D) That is not a workable set of conditions, and simply confirms defendant's unwillingness to submit to medication. Nor has any mental health professional suggested a course of therapy that can mitigate defendant's delusions, which is not surprising when one considers that defendant rejects the notion that she needs treatment.

As to the fourth *Sell* element, that administration of antipsychotic drugs be found to be in the patient's best medical interest in light of her medical condition, the parties have not addressed Lindauer's particular medical history in detail, and in view of the other findings in this opinion I see no need to address the issue.

However, as to the first and second *Sell* elements, I believe for the following reasons that the government has failed to prove its case by clear and convincing evidence.

With respect to the first element, the government argues that acting as an unregistered agent of a foreign power inimical to this country's interests is a serious crime, as indeed it is, and that in assessing the government's interest in prosecution the court should look no further than the 10–year maximum sentence that Lindauer faces if she is convicted, drawing from the reference in *Gomes* to the penalty that defendant faced. For the reasons set forth immediately below, I disagree.

As noted above, the Supreme Court has directed that I consider "the facts of the individual case in evaluating the Government's interest in prosecution." 519 U.S. at 180, 117 S.Ct. 644. The dentist in *Sell* could commit the crimes with which he was charged—submitting false medical claims and money laundering—without interacting personally with anyone. The defendant in *Gomes*, charged as a felon in possession of a weapon, could do that and more without interacting personally with anyone, except insofar as he might threaten or shoot someone. Lindauer, on the other hand, could not act successfully as an agent of the Iraqi government without in some way influencing normal people. I recognize that it is only with great diffidence that a court should examine a case before it has been tried, but the Supreme Court has said in essence that I must consider whatever reality is presented to me, fragmentary though it may be. That is what I take the Court to mean by "consider the facts of the individual case." Appropriately diffident though I am, there

is no indication that Lindauer ever came close to influencing anyone, or could have. The indictment charges only what it describes as an unsuccessful attempt to influence an unnamed government official, and the record shows that even lay people recognize that she is seriously disturbed. *See supra* at 564. As is also noted above, Lindauer has been found to pose a threat neither to herself nor to others. (*Id.*) The government's interest here in prosecuting this defendant is significantly weaker than it was in either *Sell* or *Gomes;* it would be a denial of reality—of "the facts of the individual case"—to find otherwise.

As to the second *Sell* factor, the government's case as proved before me was neither clear nor convincing. First, although I do not dispute the sincerity of Dr. Vas's testimony, or denigrate his qualifications, his testimony was formulaic and conclusory. The principal witness for the government was Dr. Kleinman, and his unguided testimony was not that forced administration of antipsychotic drugs was highly likely to succeed, but rather that it offered the only possibility of success. Those are two very different standards. Even under the leading examination of the prosecutor, his most emphatic endorsement of forced medication was that such treatment would "improve Ms. Lindauer's chances to be restored to mental competency to stand trial." (*Id.* at 87) The most forceful recommendation for antipsychotic medication contained in his April 7, 2006, report was that second generation or atypical medication "would reasonably likely—safely—help her." (Kleinman 4/7/06 Report at 10) Even that statement, which, as noted, was supported solely by studies reflecting anecdotal evidence, seems to fall short of the high likelihood required by *Sell.* Further, even if one were to read that statement, standing alone, as consistent with the requirements of *Sell,* one must recognize also that it does not stand alone. It is

contradicted by Dr. Goldstein's view, and mitigated substantially by Lindauer's lengthy delusional history. Dr. Drob pointed out that delusions of long standing "are very difficult to treat, in large measure because the individual has built his/her entire identity around the belief in their validity." (Drob Report 2/28/05 at 15)

In sum, the gaps in the medical literature and experience pointed out by Dr. Goldstein as described above, including the unreliability of anecdotal evidence and the absence of controlled studies; Dr. Goldstein's own view that medication is unlikely to help, which is supported by the length of this defendant's delusional history; and the reasonable possibility that forced medication would simply strengthen Lindauer's paranoid tendencies and distance her still further from her lawyer (*see supra* at 569), all demonstrate that there is simply not enough here to warrant a finding by clear and convincing evidence that Lindauer is substantially likely to be rendered competent by forced medication and substantially unlikely to suffer effects that will impinge upon a fair trial.

For the above reasons, the government's motion is denied.

SO ORDERED.