**UNITED STATES of America,
Plaintiff,**

v.

**Osmond DECOTEAU, Defendant.**

**No. 08–CR–736 (ENV).**

United States District Court,
E.D. New York.

April 30, 2012.

Daniel A. Spector, Jonathan E. Green, United States Attorneys Office, Brooklyn, NY, for Plaintiff.

Michael Daniel Weil, Federal Defenders of New York, Inc., Brooklyn, NY, for Defendant.

## MEMORANDUM AND ORDER

VITALIANO, District Judge.

Osmond Decoteau has been indicted for wire fraud, has entered a plea of not guilty, and remains in custody pending disposition of his case. The case cannot proceed to disposition because Decoteau suffers from a rare mental illness rendering him incompetent to stand trial. Although medical authorities are united in the belief that his condition is treatable, Decoteau denies he is mentally ill and refuses to accept treatment.

The government has moved under 18 U.S.C. § 4241(d) for an order directing that Decoteau be forcibly medicated with anti-psychotic drugs to restore his mental competence. After initially considering the motion to forcibly medicate, including the related evidentiary record, the Court ordered an alternative "talk therapy" treatment for a period of four months, and held the government's motion in abeyance pending a report on the alternative treatment's outcome. Unfortunately, the Court has since been advised that the alternative treatment has failed. The report of the treatment's failure is unchallenged, and Decoteau remains incompetent to stand trial. In the aftermath of that failure, the government's motion to forcibly medicate Decoteau has been renewed. For the following reasons, it is granted.

## I. Background

Decoteau was indicted on October 23, 2008 for conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349. In summary, the government alleges that Decoteau took part in a scheme in which he stole mortgage payoff checks, which were provided by new lenders and intended to pay off prior loans from different lenders, by convincing the new lenders that companies Decoteau controlled were servicing the prior loans. (Indictment and Complaint.) Decoteau was in Trinidad when the charges against him were filed. He returned to the United States aware there was an outstanding warrant for his arrest. (Transcript of Bail Application of Sept. 17, 2008, Dkt. No. 25.) He has been in custody since his arrest at John F. Kennedy International Airport in August 2008.

Based on suggestions of possible mental illness, including apparent delusional references made in open court, Decoteau underwent a court-ordered examination from March 26, 2009 until April 27, 2009, pursuant to 18 U.S.C. §§ 4241 and 4247, to consider whether he was competent to stand trial. (Order, March 13, 3009; Forensic Report dated May 20, 2009(GX2).) Doctors at the Federal Medical Center in Devens, Massachusetts ("Devens") performed the ordered examination. They diagnosed Decoteau with delusional disorder, grandiose type and found him incompetent to stand trial. (GX2.) After the Court reviewed the report from Devens, Decoteau was transferred to a Bureau of Prisons ("BOP") medical facility in Butner, North Carolina ("Butner") for further evaluation and treatment. (Order, Oct. 2, 2009; GX2 at 10.) And, in a report dated March 4, 2010, doctors at Butner concurred in the findings made at Devens. (Forensic Report dated March 4, 2010(GX3).)

Decoteau has exhibited delusions in which, for example, the Lord, Jesus Christ, tells him he is a prophet having important religious information to spread to the world. (GX3 at 7.) Defendant believes that Jesus has told him that he will be released from prison soon, even if he pleads guilty. (GX2 at 9; DXB at 9.) He has become irritated when doctors have attempted to discuss mental illness with him, and he has refused anti-psychotic medication. (GX3 at 7.)

The Butner report recommended forcibly medicating Decoteau to restore his competence. (GX3 at 8–10.) At an in-court status conference on June 23, 2010, however, Decoteau agreed to take medication. (Minute Entry, June 23, 2010.) The Court then ordered that Decoteau be transferred back to a federal medical center for treatment. (Order, June 28, 2010.) But when he was returned to Butner, Decoteau again refused medication. Given the refusal, the government sought involuntary medication. The Court next ordered BOP to develop a plan to do likewise, enabling the Court to properly consider the government's application. (Order, Nov. 30, 2010.)

BOP complied. (Forensic Addendum dated Dec. 15, 2010(GX4).) On February 17, 2011, the Court held an evidentiary hearing in accordance with *Sell v. United States*, 539 U.S. 166, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003) (the "*Sell* hearing"). At the *Sell* hearing, the government presented the testimony of Bruce Berger, M.D., a staff psychiatrist in the Mental Health Department at Butner, and of Jill Grant, Psy.D., a staff psychologist at Butner. The defense called Lawrence A. Siegel, M.D., a psychiatrist in private practice. All three were recognized by the Court as experts without objection.

Dr. Berger offered the opinion that Decoteau was not competent to stand trial, having diagnosed him with delusional disorder, grandiose type and having recommended treatment with anti-psychotic medication. (Transcript of the *Sell* hearing ("Tr.") at 10, 16–17, 22.) In documenting Decoteau's refusal to take anti-psychotic medication, Dr. Berger also explained that Decoteau had refused treatment because he did, and does, not accept that he is mentally ill. Dr. Berger opined that defendant will not change his mind. (Tr. at 21.) Moreover, Dr. Berger opined that "talk therapy" alone will not restore Decoteau's competence. (Tr. at 23, 71, 77.)

Dr. Berger estimated that he had treated about 40 to 60 patients with delusional disorder during his twenty-plus years at Butner. (Tr. at 10, 12–13.) Based on literature in the field and his experience, Dr. Berger concluded that anti-psychotic medication provides a "substantial probability" of restoring Decoteau's competence. (Tr. at 22.) In addition, Dr. Berger testified that a study done at Butner (the "Herbel study") indicates a chance of restoration of about 70% with such treatment. (Tr. at 22–24 (citing Bryon Herbel & Hans Stelmach, *Involuntary Medication Treatment for Competency Restoration of 22 Defendants With Delusional Disorder*, J. Am. Acad. Psychiatry L. (2007) (GX8)).) Dr. Berger said he expects, in Decoteau's case, medication to reach its full effectiveness within about five to six months. (Tr. at 34–35.)

The Herbel study is a retrospective review of a regimen of treatments designed to restore competence to a collection of patients. The study's findings showed restoration of mental competence in 77% of patients (17 of 22) at Butner who were (1) diagnosed with delusional disorder; (2) found mentally incompetent; and (3) involuntarily treated with anti-psychotic medication solely to restore their competence.

(GX8.) Dr. Berger admitted that the Herbel study has several limitations inviting further study, including its small sample size, a lack of study controls, that it was retrospective instead of hypothesized, and that its determinations of competency were medically, not judicially, defined determinations. (Tr. at 47–52.) In addition, only one of the patients in the Herbel study actually had the grandiose sub-type of delusional disorder afflicting Decoteau. (Tr. at 60.)

Dr. Berger also explained that, because delusional disorder is so rare, estimating only 0.03% of the population suffers from it, relatively little specific research had been performed on the effectiveness of anti-psychotic medication in treating it. (Tr. at 25, 45–46.) In contrast, significant research has been performed on other psychotic disorders in general, and schizophrenia in particular. A difference in underlying disorders, of course, might be a significant consideration when determining whether an appropriate treatment for one disorder is also an appropriate treatment for another disorder. Nonetheless, while admitting it was "plausible" that schizophrenia and delusional disorder may have different appropriate treatments because they are different disorders, Dr. Berger adhered to the opinion that the two disorders would likely have the same appropriate treatments because both disorders have psychotic symptoms and because, in dealing with mental disorders, often it is the symptoms and not the underlying disorder that is the target of the treatment. (Tr. at 14, 62–70.)

Based on his clinical experience, Dr. Berger described the proposed treatment methodology; including its risks. (Tr. at 25–39; *see* GX4 at 3–7.) He testified that if a patient like Decoteau were to be treated involuntarily, injections of Haldol, Prolixin, or Risperdal would most likely be administered. (Tr. at 28.) He explained that most patients ordered to take medication do so without physical protest. (*Id.*) But, if a patient physically resisted treatment, Butner staff would restrain him and inject the medicine similarly. (Tr. at 35–38.)

The potential side effects of the injectables, according to Dr. Berger, include muscle stiffness, restlessness, tardive dyskinesia, weight gain, increased disposition to diabetes, and drowsiness. (Tr. at 29–35.) He explained that tardive dyskinesia is a potentially permanent, involuntary writhing of the hands or face that can be visually disfiguring. For patients being treated on a long-term basis, tardive dyskinesia can appear in 30% of patients over their lifetimes. (Tr. at 29.) But, it typically manifests slowly based on dosage and duration of medication, and the chance of suffering from it is about 5% per year. (Tr. at 29–30.) As Dr. Berger extrapolated from the science, if a patient like Decoteau was medicated for one year, he would have a 5% chance of developing some degree of tardive dyskinesia. (Tr. at 32.) The description had a black box warning too. He noted that neuroleptic malignant syndrome is a side effect that can be lethal. Yet, he emphasized that the syndrome is very rare, and as far as Dr. Berger knows, there has never been an incident of it at Butner. (Tr. at 32.) Dr. Berger testified further that side effects are monitored with due care, and if harmful side effects present, treatment will be stopped and/or modified by a switch to an alternative medication. (Tr. at 33.) Finally, Dr. Berger expressed the view that, if Decoteau were to be treated in this fashion, should such side effects, which did not warrant cessation of treatment, occur, they would not be substantially likely to interfere significantly with Decoteau's ability to assist in his defense. (Tr. at 34.)

Defendant's expert, Dr. Siegel, has about 30 years of experience in psychiatry. (Tr. at 96–100.) Like Dr. Berger, he diagnosed Decoteau with delusional disorder, grandiose type. (Tr. at 103.) While their conclusions as to the appropriate treatment course for a recalcitrant Decoteau differed diametrically, Dr. Siegel's testimony finds much common ground with that of Dr. Berger. Dr. Siegel agreed, for example, that Decoteau is unlikely to improve his mental state without treatment and is healthy and able to tolerate mediation. (Tr. at 134–36.) He also agreed, very importantly, that anti-psychotics are medically accepted treatments for delusional disorder, and that their side effects can generally be managed. (Tr. at 135–36.) Moreover, despite opposing forced chemical treatment in this case, Dr. Siegel would indeed recommend anti-psychotics if Decoteau were willing to accept such treatment. (Tr. at 136–140.)

For all the harmony, as night follows day, there were fundamental differences in the ultimate opinions offered by the two experts. Based on his experience and review of the scientific literature, Dr. Siegel offered that anti-psychotics have only a 50% chance of restoring Decoteau's competence. (Tr. at 103–04.) But, Dr. Siegel has, by his own admission, only "limited experience" with delusional disorder. (Tr. at 110.) He recalls treating only one patient with the malady and evaluating records of about four others. (Tr. at 110, 133.) Implicitly, therefore, and more so than Dr. Berger's opinion, Dr. Siegel's opinion relied heavily on literature and his general medical experience as compared to hands-on experience with delusional disorder.

Specifically, Dr. Siegel's testimony was based in part on a 2006 retrospective on delusional disorder treatment (the "Manschreck study"). (Tr. at 104–05 (citing Manschreck TC, Khan NL., *Recent advances in the treatment of delusional disorder*, Can. J. Psychiatry (2006) (GX11)).) The Manschreck study, which reviewed various published reports of delusional disorder, states that a "positive response" to treatment of delusional disorder with anti-psychotics was seen in about 50% of treated patients. (GX11; Tr. at 140.) Notably, Dr. Siegel acknowledged that the study "seems to [have] inconsistencies" because it also states about 50% of patients recovered and about 40% improved, which would indicate that about 90% of patients had a "positive response." (Tr. at 140–41.) He further admitted that, because the study is "unclear," Decoteau could be rendered legally competent by merely improving instead of recovering as those terms are used in the Manschreck study. (Tr. at 141–42.) At its essence, strikingly, given Dr. Siegel's testimony, the Manschreck study actually puts the chance of achieving some level of recovery as being between about 50% and 90%. That range, moreover, might still low ball the success rate in Decoteau's situation. Dr. Berger testified that rates of restoration tend to be higher when medication adherence is ensured, as would occur at Butner, and that the Manschreck study indicates its subjects had nonadherence problems which were "a possible reason that people were not responding to that medication." (Tr. at 88–89; *see* GX11 at 4 (noting "nonadherence was a problem in a frequent number of cases").)

Clearly, however, the opinion of Dr. Berger, though unbowed, did not go unsullied. Dr. Siegel attacked some of its bases. He questioned the Herbel study's relevance to Decoteau's condition because the study included only one patient with Decoteau's sub-type of grandiose delusions. (Tr. at 105–06.) On the other hand, Dr. Siegel also indicated anti-psychotic drugs are the generally recommended treatment for de-

lusional disorder regardless of sub-type. (Tr. 140.) Dr. Siegel did pinpoint limitations of the Herbel study, but they were similar to those identified and assessed in the opinion offered by Dr. Berger. (Tr. at 105–06.) Additionally, Dr. Siegel testified that he was wary of considering studies on schizophrenia in connection with treatment of delusional disorder because the underlying causes of the afflictions are not known. (Tr. at 108.)

Most importantly, in the final analysis, Dr. Siegel did offer an alternative course of treatment for the Court's consideration. He identified cognitive behavioral therapy (a type of "talk therapy"), and testified that it presented about a 20 or 30% chance of restoring Decoteau's competence if used as the sole treatment. (Tr. at 129–30.) But, when pressed about the basis of this opinion as to the effectiveness of cognitive behavioral therapy, he admitted that the success rate he proffered was a "guesstimate" based on a study with unclear language. (*Id.*)

The evidence did not end with the dueling assessments of the two psychiatrists. The government called a second expert, Dr. Grant, who had met with Decoteau between six and ten times prior to the hearing. (Tr. at 148.) Prophetically, Dr. Grant, with the benefit of her clinical interactions with him, opined that Decoteau would be unwilling to participate in talk therapy in any effective way. (Tr. at 149.) Bluntly, in sum, she predicted any such effort would fail.

With the benefit of post-hearing briefing and oral argument, the Court fully considered the record. Because of the serious liberty interests at stake, the Court decided, despite the absence of solid proof as to its efficacy, noninvasive cognitive behavioral therapy should be attempted before further consideration of forced anti-psychotic medication. Implementing the Court's order, (Order, June 13, 2011), Dr. Charles K. Burnett, Ph.D., Dr. P.H., a psychologist with no allegiance to either side, met with Decoteau to attempt cognitive behavioral therapy. Unfortunately, Dr. Burnett reported on January 3, 2012 that he was unable to successfully treat Decoteau because of Decoteau's (1) unwillingness to engage in the treatment; (2) refusal to acknowledge any problems in his life that he would like to change; and (3) belief that everyone but himself was incompetent. (Dr. Burnett's Confidential Psychological Report signed Jan. 3, 2012, Dkt. No. 76.) Supplemental oral argument followed on February 3, 2012.

## II. *Discussion*

■ Mentally incompetent criminal defendants have a significant constitutionally protected liberty interest in refusing anti-psychotic drugs. *Sell,* 539 U.S. at 178, 123 S.Ct. 2174 (citing *Washington v. Harper,* 494 U.S. 210, 221, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990); *Riggins v. Nevada,* 504 U.S. 127, 134–35, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992)). Yet, mental incompetence prevents criminal defendants from being tried. *Brown v. Warden,* 682 F.2d 348, 351 (2d Cir.1982); 18 U.S.C. § 4244. At the same time, of course, the government has a significant interest in pursuing justice and in bringing accused defendants to trial. *Sell,* 539 U.S. at 179, 123 S.Ct. 2174. Neither set of interests, however, is absolute. Not surprisingly, when a treatment exists that could restore a defendant to competence, the conflict between (1) the defendant's liberty interest in refusing the treatment and (2) the government's interest in pursuing justice at trial, must be balanced.

■ In *Sell,* the Supreme Court considered this very conflict and concluded that "the Constitution [can] permit[ ] the Government involuntarily to administer anti-psychotic drugs to a mentally ill defendant

facing serious criminal charges in order to render that defendant competent to stand trial." 539 U.S. at 179, 123 S.Ct. 2174. Such involuntary administration of medication is permissible, however, only when the following four conditions are met: "(1) there are important government interests in trying the individual; (2) the treatment will significantly further those interests; (3) the treatment is necessary to further those interests, considering any less intrusive alternatives; and (4) the treatment is medically appropriate." [1] *United States v. Magassouba*, 544 F.3d 387, 396 (2d Cir. 2008) (citing *Sell*, 539 U.S. at 180–81, 123 S.Ct. 2174). Moreover, the government must demonstrate each of these conditions by clear and convincing evidence. *United States v. Gomes*, 387 F.3d 157, 160 (2d Cir.2004).

### A. The Government's Interest in Trying Decoteau is Important

*Sell* has already established that the government's interest in trying an individual charged with a serious crime, whether against a person or property, is important. 539 U.S. at 180, 123 S.Ct. 2174. *Sell* also holds, however, that even when the charged crime is serious, "special circumstances" may lessen the importance of the governmental interest, rendering it below that required to support forced medication. *Id.*; *see also Gomes*, 387 F.3d at 160. In balancing a crime's seriousness against potential "special circumstances," courts have looked to the applicable statutory maximum sentence, the likely United States Sentencing Guidelines range, the amount of time the defendant has already

been held in custody, and the prospect of continued civil commitment should the defendant not be tried.[2] *See Sell*, 539 U.S. at 180, 123 S.Ct. 2174 (noting the relevance of potential, future civil commitment); *United States v. Bedros*, No. 06–249, 2008 WL 2437865, *3 (E.D.N.Y. June 13, 2008) (finding a maximum sentence of 20 years is indicative of a serious crime); *United States v. Weinberg*, 743 F.Supp.2d 234, 237–38 (W.D.N.Y.2010) (finding the government's interest was not important despite a five year maximum sentence because the defendant faced a likely Guidelines range of only 6–12 months in prison and had already spent 21 months in custody); *United States v. Palmer*, 507 F.3d 300, 303–304 (5th Cir.2007) (affirming a finding that a crime with a maximum sentence of ten years and a Guidelines range of 15–21 months was serious).

There can be no dispute that Decoteau is charged with a serious crime. The government alleges that he was the mastermind in a multi-year mortgage fraud scheme that caused over $20 million in losses. Further, the government argues Decoteau faces a likely Guidelines range of 210–262 months and a maximum sentence of 30 years. Though defendant takes issue with the particulars of the sentencing exposure, he agrees that the maximum sentence he faces is 30 years and, notably, he explicitly admits the alleged crime is serious. (Defendant's Memorandum of Law, Dkt. No. 62, at 6–7 ("No doubt, Mr. Decoteau's alleged crime is a serious one....")) The government has facially satisfied its

---

1. *Harper* describes another situation in which a defendant may be forcibly medicated: when he poses a danger to himself or others. 494 U.S. at 221, 110 S.Ct. 1028. But, the parties agree that Decoteau does not pose such a risk. Thus, *Sell* provides the only route to forcibly medicating Decoteau.

2. Because the parties agree that Decoteau is not a danger to himself or others, neither party argues that Decoteau is a likely candidate for civil confinement.

burden on this prong of *Sell* to show "seriousness."

Notwithstanding, the first prong requires more. The inquiry next focuses on whether any special circumstances, despite the seriousness of the crime, reduce the government's interests to less than "important." Decoteau argues the government's interest is significantly undercut for three principal reasons, which will be addressed in turn.

First, the defense argues that the Court should consider a reduced sentencing range of 151–188 months by assuming Decoteau will plead guilty because he has expressed an intent to do so. The argument overlooks the fact that Decoteau's incompetence makes any such plan or intent unreliable. Dispositively, furthermore, the argument is fodder for a classic demurrer. Even if the Court were to assume Decoteau would plead guilty and be sentenced to 151 months, the nearly nine years of additional prison time Decoteau would face would still be powerful evidence of an "important" government interest in vindicating justice by seeking conviction.[3]

As noted, defendant has a second string on his bow. He argues that because (1) he voluntarily returned to the country to be arrested; (2) he has psychiatric problems; and (3) some courts have found some of the potential Guidelines enhancements at issue here to unfairly overlap in certain financial crimes, his actual sentence would fall below the otherwise applicable Guidelines range. For whatever value these arguments may have at the time of sentence in obtaining a departure, variance, or nonguideline sentence, they have little value now. Each is refutable. Decoteau could have been extradited,[4] but chose to avoid it, his delusional disorder has already been well-managed by BOP, and, not only have other courts fully applied the enhancements, but without the benefit of presentence investigation and victim impact statements, it is impossible to assess now what, if any, relief from technically-applicable enhancements is appropriate. The discounting suggested by defendant is highly speculative, and, in any event, does not diminish the government's clear and convincing showing that the sentence likely to be imposed on Decoteau, if found guilty, would be within a significant range of punishment sufficiently long to support the finding that the government's interest in prosecuting him is "important."

Finally, Decoteau argues that, since the government would continue to have an open case against him if he were released and later regain competence, the government's interest in forcing medication on him and prosecuting him now is low. The argument is wholly without merit. All the experts agree that Decoteau is not likely to recover on his own, and there is absolutely no reason to believe he will voluntarily begin taking appropriate medication if released. Even assuming a miraculous recovery miles down the road, staleness would hardly leave the prosecution viable. Realistically, it is not likely Decoteau would ever be tried if the government's motion is denied and Decoteau were released now.[5]

---

3. Nor would the calculus change if defendant sought and perfected an interlocutory appeal of this Order and reduced his remaining likely prison exposure by the time served in custody during the appeal. Decoteau would still face about eight additional years of custody.

4. *See, e.g., United States v. Clarke,* 767 F.Supp.2d 12, 18 (D.D.C.2011); *United States v. Straker,* 596 F.Supp.2d 80, 83 (D.D.C.2009).

5. As part of his argument, defendant contends the government's case will not be hurt by the passage of time because (1) the case will rely "largely" on easily preserved documents and

In sum, defendant stands charged with a very serious crime. The relevant circumstances, whether considered separately or with synergy among them, do not reduce the importance of the government's interest in trying Decoteau to a level below that required by the first prong of *Sell*.

## B. The Proposed Treatment Will Significantly Further the Important Interest

■ A proposed treatment significantly furthers an important government interest if the treatment (1) is "substantially likely" to restore the defendant to competence while (2) being "substantially unlikely" to cause side effects that will interfere significantly with the defendant's ability to assist in his defense. *Gomes*, 387 F.3d at 161 (citing *Sell*, 539 U.S. at 181, 123 S.Ct. 2174). Thereafter, the judicial waters are somewhat uncharted. No controlling case law defines "substantially likely" with precision. The Second Circuit has found that a 70% success rate is adequate. *Id.* at 161–62. A court in this district has found that 60%, or perhaps an even lower percentage, is adequate. *Bedros*, 2008 WL 2437865, *3 (finding a 60% chance of restoration to be sufficient, even when the prosecution's expert acknowledged that the chance could be less).

In *Gomes*, the Second Circuit affirmed an order forcing a defendant suffering from delusional disorder of grandiose and persecutory type to be medicated with anti-psychotic drugs solely to restore his competence. 387 F.3d at 159–63. Importantly, the government's evidence of the treatment's efficacy in *Gomes* was (1) "chiefly" expert testimony indicating a

"substantial probability" of restoration and (2) the BOP's experience of a 70% success rate in restoring defendants to competence with anti-psychotic drugs. *Id.* at 161–62. The parallel here is striking. The government has offered Dr. Berger's clinical opinion that the medication proposed for Decoteau would have a "substantial probability" of success, which is bolstered by his reliance on the Herbel study indicating a 77% success rate and which, like in *Gomes*, is based on the BOP's experience. (Tr. at 22–24.) Dr. Berger also opined that the extensive documented success in treating schizophrenia and other psychotic disorders with anti-psychotic drugs provides further reason to believe such mediations would be successful in treating Decoteau's illness. (Tr. at 14, 62–70.) The government, to cut to the chase, provides a *prima facie* showing by clear and convincing evidence of proposed treatment efficacy stronger than the one the Second Circuit found adequate in *Gomes*.

Decoteau argues, however, that *Gomes* is not controlling because, unlike here, there was no challenge to the government's evidence of efficacy. Decoteau, to the contrary, clearly attacks the Herbel study, which reports on a BOP experience mirroring that in *Gomes*. He is not the first to do so. In *United States v. Feretti*, 1:08–m–51, 2009 WL 4730227, at *5 (N.D.N.Y. Dec. 2, 2009) the district court declined to order forced medication and distinguished *Gomes*. In fact, despite that the basis for the government's expert's opinion on the efficacy of the treatment in *Feretti* was "unclear," the Herbel study was front and center. *Feretti*, 2009 WL 4730227, at *5. Of it, the court found, "[w]hile the Herbel & Stelmach study pro-

---

(2) Decoteau's proffer statements drastically limit his defense options. But, even if he would eventually face trial, witness testimony is very useful in proving intent to defraud, and the government contends it would pres-

ent such testimony. Fading memories, if not the outright unavailability of witnesses or documents are obvious concerns in any long-delayed trial.

vides some evidence of the probability of success, it falls short on its own of providing clear and convincing evidence of the success rate." *Id.* But, even if the Court were to agree with *Feretti's* observation, the government's proof here is not limited to the findings in that study. It is Dr. Berger's expert opinion, informed by the Herbel study, among others, and based on his own clinical experience, that is the core of the proof upon which the government's motion is founded. That is to say, there is far more here than in *Feretti.*

Decoteau also relies on *United States v. Ruiz–Gaxiola,* 623 F.3d 684 (9th Cir.2010) to attack the Herbel study. In *Ruiz–Gaxiola,* the Ninth Circuit found that a combination of the Herbel study and expert testimony did not provide clear and convincing evidence that *Sell's* second prong was satisfied. 623 F.3d at 696–701. But, *Ruiz–Gaxiola* also found (1) the government expert there had been practicing for only two years and had not read "particularly relevant" studies that had been identified for him and (2) that the defense's expert "had a far superior knowledge base." *Id.* at 698–700. At bottom, the failure of the government's case to achieve "clear and convincing" status stemmed from the inadequacy of the government's expert. The ruling was not peculiar to the Herbel study. Dr. Berger, in stark contrast, has had far more experience in treating delusional disorder than has Dr. Siegel. Indeed, it is hard to fathom an expert with clinical experience greater than that of Dr. Berger on the subject of treatment efficacy for delusional disorder, particularly in the controlled environment of a prison medical facility.

Decoteau seeks refuge in *United States v. White,* 620 F.3d 401 (4th Cir.2010) as

well. *White* found that "the Herbel study is of limited assistance in determining whether White could reliably be made competent for trial." *Id.* at 421. Yet, *White* makes clear that it primarily based its "limited assistance" comment on findings that (1) White was female, (2) "men and women often react differently to medications," and (3) the subjects of the Herbel study were all males. *Id.* Put another way, the successful attack on the Herbel study that undermined the government's case on this *Sell* prong in *White* is absolutely irrelevant to the facts here.

Pared to the bone, the pending question is whether the treatment plan proposed by Dr. Berger is substantially likely to restore defendant to competence. The Court finds the evidence is clear and convincing that anti-psychotic chemical treatment has been an effective treatment for the symptoms manifested by Decoteau which result from his diagnosed delusional disorder. Even Dr. Siegel stated he has "probably" ordered such treatment in his own practice. (Tr. 110.) Therefore, based on the entire record, clear and convincing evidence supports, and the Court concludes, that it is substantially likely that Dr. Berger's proposed treatment will restore Decoteau to a level of competence sufficient to enable him to stand trial and that the treatment is substantially unlikely to cause side effects that will interfere significantly with Decoteau's ability to assist in his defense.[6]

### C. No Alternative Treatment is Likely to Achieve Substantially the Same Result

█ The government's experts did not suggest that any potential alternative

---

6. Even if not considering Dr. Berger's testimony regarding the treatment of schizophrenia with anti-psychotics, the Court makes the same finding based on Dr. Berger's opinion as informed by his clinical experience treating delusional disorder (without regard to subtype) and the Herbel study.

treatment was viable. Decoteau's expert, of course, had advocated cognitive behavioral therapy, but admitted it had only a 20 or 30% chance of improving Decoteau's mental condition. Further, Dr. Siegel was unable to convincingly explain how the literature even supported his claim of 20 or 30% effectiveness. (Tr. at 129–30.)

Notwithstanding bleak prospects, the Court was willing to give noninvasive cognitive behavioral therapy a chance to succeed and ordered that it be pursued further. (Order, June 13, 2011.) As noted earlier, it failed. On this point, the experts are united: there is no other alternate treatment that is likely to achieve substantially the same result, *i.e.*, sufficient restoration of competence, as the medication the government asks the Court to order to be used by force, if necessary. In fact, no other treatment is identified at all. This *Sell* prong is satisfied as well.

### D. The Treatment is Medically Appropriate

■ Dr. Berger testified that anti-psychotic mediation is the treatment of choice for delusional disorder. (Tr. at 45.) Even Dr. Siegel testified that treating Decoteau with anti-psychotic mediation would be medically appropriate. (Tr. at 120, 135, 140.) Dr. Berger singled out the Herbel study as supporting this view.[7] The defense objects, nonetheless, that the treatment is not appropriate because of its potential side effects. But, Dr. Berger testified the side effects generally can be safely managed. (Tr. at 34.) Further, Dr. Siegel offered no disagreement. (Tr. at 136.) The evidence taken as a whole demonstrates that the risks and severity

of the potential side effects are not sufficient to render the proposed treatment medically inappropriate.

■ Finally, defendant's argument that the government has failed to establish that Decoteau will voluntarily continue to take the medicine after he is no longer forced to do so (*i.e.*, after trial) is irrelevant. Although a patient's overall well-being is relevant to *Sell's* fourth prong, *see United States v. Lindauer*, 448 F.Supp.2d 558, 566 (S.D.N.Y.2006), the government has met its burden for the period during which the medication is being administered forcibly. At any rate, the Court observes that nothing in the record indicates that if Decoteau stopped taking medicine of his own volition that he thereafter would be worse off than if he had never taken it at all. Indeed, the evidence is without limitation that any sign of serious medical harm to Decoteau resulting from the medication (either immediate or prospective) would result in modification or cessation of treatment.

Accordingly, the Court finds that forced treatment with anti-psychotic mediations in line with the protocol proposed by the government is medically appropriate, and that the government has established that element by clear and convincing evidence.

### III. *Conclusion*

After considering the entire record, the Court finds the government has proven each of the *Sell* factors by clear and convincing evidence. Its motion that Decoteau be medicated involuntarily, if necessary, to restore his competence to stand trial is granted.

---

7. While each patient presents a potentially unique case, the Court notes that numerous courts have held that involuntary treatment with anti-psychotic mediation is a medically appropriate treatment for delusional disorder. *E.g.*, *Gomes*, 387 F.3d at 163; *United States v.* *Steward*, No. 06–864, 2009 WL 4839529, at *5 (C.D.Cal. Dec. 14, 2009); *United States v. Walton*, No. 08–20599, 2009 WL 3562507, at *2 (E.D.Mich. Oct. 28, 2009); *United States v. Mesfun*, No. 05–858, 2009 WL 1704308, at *19 (D.N.J. June 17, 2009).

The Court, therefore, orders, pursuant to 18 U.S.C. § 4241(d)(2)(A), that defendant shall remain in the custody of the Attorney General at FMC Butner for further treatment to restore him to competence to proceed to trial. Defendant may be involuntarily medicated to restore his competence if defendant does not voluntarily accept medication, all in accordance with Dr. Berger's proposed treatment plan. In addition, the staff at Butner may perform involuntary physical and laboratory assessments and monitoring that are clinically indicated, if defendant does not voluntarily submit to such assessments and monitoring. The ordered period of treatment shall be four months from its commencement, which may be extended upon court approval.

The government shall file monthly progress reports with the Court during the treatment period, with the fourth report being filed at least two weeks before the end of the four month period concurrently with any request to extend the period. If there is a change in relevant circumstances, including changes in Decoteau's medical condition, defendant or the government may move at any time to amend this order. If Decoteau is restored to competence, a report shall be filed with the Court discussing the results of the treatment, whether and how the medications will affect Decoteau at trial, and how to monitor for effects of the treatment throughout trial. If, on the other hand, it is determined that the treatment has failed, the government shall file a report so advising the Court and assessing defendant's current mental and physical condition.

Finally, leave is granted to file an interlocutory appeal within 14 days of the entry of this order, which, except for the order that Decoteau remain at FMC Butner, is stayed pending possible appeal. *Sell,* 539 U.S. at 176, 123 S.Ct. 2174 (holding forced medication orders are immediately appealable).

SO ORDERED.