**UNITED STATES of America,
Plaintiff,**

v.

**Osmond DECOTEAU, Defendant.**

No. 08–CR–736 (ENV).

United States District Court,
E.D. New York.

Nov. 1, 2012.

---

Daniel A. Spector, Jonathan E. Green, United States Attorneys Office, Brooklyn, NY, for Plaintiff.

Michael Daniel Weil, Federal Defenders of New York, Inc., Brooklyn, NY, for Defendant.

## MEMORANDUM AND ORDER

VITALIANO, District Judge.

Now before the Court is the government's motion to continue the involuntary medication of defendant with anti-psychotic drugs to restore his mental competence sufficiently to enable him to assist with his defense. A four-month period of such forced medication was authorized by the Court on April 30, 2012, *United States v. Decoteau*, 857 F.Supp.2d 295 (E.D.N.Y. 2012) ("*Decoteau I* "); the authority expired on September 15, 2012 (see Order, July 31, 2012). Familiarity with *Decoteau I* is presumed and, thus, the extensive procedural history and factual record detailed in that opinion will, for the most part, not be repeated here. The record evidence developed in *Decoteau I* is before the Court on this motion and is supplemented by the evidence developed on the pending application by the government.

### Background

On February 17, 2011, the Court held an evidentiary hearing (the "February hearing") in accordance with *Sell v. United States*, 539 U.S. 166, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003). At the February hearing, the government presented the testimony of Bruce Berger, M.D. a staff psychiatrist at the Bureau of Prisons ("BOP") medical facility in Butner, North Carolina. Dr. Berger testified, in sum, that his training and experience, buttressed by a study done at Butner, Bryon Herbel & Hans Stelmach, *Involuntary Medication Treatment for Competency Restoration of 22 Defendants With Delusional Disorder*, 35 J. Am. Acad. Psychiatry L. 47 (2007) (the "Herbel study"), were the bases of his opinion that involuntary medication with anti-psychotic drugs provided about a 70% chance of restoring Decoteau to competency. (February hearing Tr. at 22, 24.) Dr. Berger explained

that, if medication were administered involuntarily, injections of Haldol, Prolixin, or Risperdal would most likely be used. (February hearing Tr. at 28.) Importantly, given the government's current request to continue treatment beyond the previously ordered four-month period, Dr. Berger opined then that the selected medication would likely reach its full effectiveness within about five to six months. (February hearing Tr. at 34–35.) Specifically, he testified at the initial hearing that:

> Typically you have to max out your therapeutic gains over about five to six months, sometimes you get much more rapidly than that. But after about six months, that's typically when we see a particular medicine how well it is going to work long-term.

*Id.* Moreover, when the Court asked Dr. Berger whether there was a 30% chance that a particular medication would not "work at all," he responded, "Exactly. But that would not imply that all other antipsychotics wouldn't work, but that particular one, 30 percent, yes." (February hearing Tr. at 35.) *Decoteau I* issued on April 30, 2012 and authorized involuntary treatment to begin after a stay of 14 days to allow Decoteau to appeal. He did not do so.

In line with the Court's mandate, Decoteau's medical team at Butner filed a report on August 28, 2012 (the "August report"), advising that Decoteau had begun taking oral tablets of Risperdal on May 16, 2012. Then, on May 23, 2012, after refusing to continue taking the oral medication, defendant was injected with 25 mg of long-acting Risperdal Consta, which was to be administered every two weeks. The dosage was increased incrementally until August 2, 2012, when Decoteau was given the maximum dosage of 50 mg. After only three weeks of taking the maximum dosage, Decoteau's progress was assessed. At that time, physicians determined that Decoteau had not responded to the medicine as of the date of the report but concluded that "there is a substantial probability Mr. Decoteau can be restored to competency with continued involuntarily administered anti-psychotic medication." (August report at 6–7.) Additionally, the only observed side effect of the treatment was drowsiness.[1] *Id.* at 4.

On August 30, 2012, the government filed a letter indicating that it was relying on the August report on its motion to continue involuntary medication pursuant to the treatment plan adopted in *Decoteau I.* Defendant opposed the extension, arguing that the existing record could not support forcible medication beyond the four-month period originally ordered.[2] In

1. There is no claim that Decoteau has experienced any other side effects of Risperdal, nor did the Court observe any apparent side effects during the September 7, 2012 or September 11, 2012 hearings, at which Decoteau participated by video conference.

2. Decoteau challenged in his brief, but did not press at the subsequent hearing, the specificity of the government's forced medication application. In particular, he faulted the plan for failing to specify the medication and dosage range that would be used by the government. (Def.'s Resp. at 2, n. 1.) The treatment plan, in fact, listed seven drugs from which Decoteau was able to choose as well as the dosage range for the oral form of each drug. It also detailed under what conditions the Butner staff would substitute an intravenous version of the chosen medication and enumerated the starting dosages of each medication. Decoteau chose Risperdal and has, to date, been treated with only that anti-psychotic. The treatment plan did not list a maximum intravenous dosage, but as Dr. Berger testified, the government never exceeded the "upper level dose." (September 11 hearing Tr. at 4.) Dr. Berger testified further that the Physician's Desk Reference does not list an upper limit for Haldol, the medication Dr. Berger now recommends for Decoteau. *Id.* at 7. However, Dr. Berger testified that in

particular, defendant queried whether the treating physicians' narrative supported their opinion that "there is a 'substantial probability' Mr. Decoteau will be restored to competency."[3] (Def.'s Resp. at 1.) Decoteau argued further that the August report justified, at most, a two week extension to complete an adequate trial of Risperdal, and that both Dr. Berger's testimony at the February hearing and the Herbel study supported a treatment period of no longer than five months. Additionally, Decoteau urged the Court to hold further hearings before extending the treatment period or allowing the government to change the existing medication protocol during any period of extension. (Those hearings, of course, were held.)

In its reply papers, the government reiterated its position that continued medication would likely render Decoteau competent to stand trial, and, as Decoteau foresaw, noted that Decoteau's treating physicians proposed switching his medication from Risperdal to Haldol, one of the other medications authorized by *Decoteau*

I. Plus, the government supplemented its reply with a new study showing a 73% rate of competency restoration among incompetent detainees being medicated involuntarily for delusional disorder: Robert Cochrane, Bryon Herbel, Maureen Reardon & Kristina Lloyd, *The Sell Effect: Involuntary Medication Treatment is a "Clear and Convincing" Success*, Law & Hum. Behav., Tbl. 4 (2012) (the "Cochrane study"). The government argued that, while Decoteau had not responded to Risperdal, both the Cochrane and Herbel studies supported the treating doctors' belief that it would be premature to conclude that treatment would not succeed. Having received only three months of Risperdal— and just over one month at the upper level dosage—Decoteau's treatment time fell below the average period of treatment for the patients who were included in either the Herbel or Cochrane studies. Indeed, as the government noted, some of the subjects analyzed in connection with the Cochrane study underwent treatment for a year or more.[4] (*See* Cochrane study at 7.) The

---

clinical practice, he typically prescribes no more than 250 milligrams. *Id.* The Court interprets this testimony as setting an upper limit on the Haldol dosage to which Decoteau will be exposed in a renewed round of medication. Similarly, the Court incorporates by reference the maximum dosages listed in the Physician's Desk Reference with respect to the other medications from which Decoteau will be able to choose. Resultantly, an upper limit for each is made part of the ordered treatment plan.

3. The defense contended that the August Report contradicted the doctors' ultimate opinion, because it included comments such as that Decoteau's prognosis was "fair to guarded" and that there have been "no demonstrable changes in his symptoms." (Def's Resp. at 1.) Decoteau also attacked the report as overly hypothetical for linking Decoteau's lack of progress to the short time that he had received the maximum does of Risperdal. With the benefit of Dr. Berger's testimony, the

Court has greater context in which to analyze the August report and reaches the conclusion that neither the lack of progress at the time the report was written, nor the difficulty in prescribing precisely the best choice of medication and dosage for Decoteau preclude the government from satisfying its burden to show a substantial likelihood that Decoteau will be restored to competency with continued treatment. The Court notes that the "fair to guarded" language pinpointed by the defense is present in a Forensic Evaluation dated March 15, 2010, too. (GX3 at 7.) Just as the sentence did not undermine the government's argument in *Decoteau I*, it does not derail the government's instant motion.

4. The Cochrane study covers a group of detainees suffering a range of mental illnesses. It does not elaborate upon which subjects required treatment for over one year. However, it notes that delusions tend to respond more slowly than hallucinations, implying that defendants suffering delusional disorder

government, of course, and significantly, also relied upon Dr. Berger's testimony at the February hearing as evidence that the failure of a single drug did not undermine the potential for success with a second and different drug therapy.

On September 7, 2012, the Court heard oral argument and ordered Dr. Berger and any of Decoteau's other necessary treating medical personnel to appear at a hearing by telephone conference on September 11, 2012 (the "September hearing") to supplement the record and provide defense counsel the opportunity to cross examine them. At the September hearing, Dr. Berger appeared solo and reiterated that there remains a substantial likelihood that antipsychotic medication can restore Decoteau to a legally sufficient level of competence to assist at his trial. He observed that "very often, but not always," a second medication succeeds after the first one fails, for reasons that are "literally unknown." (September hearing Tr. at 7.) Therefore, even though the Risperdal trial had thus far failed, Dr. Berger advocated a second course of medication based on his experience "as a clinician over time that a second type of medication is generally successful more often than not."[5] (September hearing Tr. at 19.) Again citing the literature, Dr. Berger opined:

I think the previous studies and then the [Cochrane] study would say there's a substantial probability, the numerous studies specifically to the delusional dis-

order shows about 73 percent chance of the person being restored to competency with medication treatment, not single medication treatment, but medication treatment of one, two or even three trials. The study was unable to break out how many people required a second trial of medication or not, so I don't know percentages. I still think it is less likely now that he has had one failure to what percentage or what exact degree it is reduced, I honestly don't know. I still think it is substantial, but I don't have the percentages.

(September hearing Tr. at 35–36.) Dr. Berger added that the new medication should begin to take effect within two to three months, with the maximum effect manifesting in as long as five to six months. (September hearing Tr. at 8.) Although he expected a positive outcome, Dr. Berger testified that a failure of the second trial would change his opinion of Decoteau's prognosis. (September hearing Tr. at 20.) With only a single failed trial, on the other hand, when asked whether "the fact that the Risperdal failed, you still believe there's a substantial likelihood of success that Haldol will succeed?" Dr. Berger replied, "Yes," to the second clinical trial with certainty. (September hearing Tr. at 33.)

Decoteau did not call an expert witness at the September hearing but attempted to refute Dr. Berger's direct testimony on

---

may have taken longer to respond to treatment.

**5.** Having elicited that Dr. Berger would find it appropriate to prescribe an anti-psychotic medication to a voluntary patient if he estimated that the chance of success would be lower than that which he would find appropriate in the involuntary context, Decoteau argues that the Court should discount any testimony rooted in Dr. Berger's clinical practice. The Court disagrees. While Dr. Berger testified to his ordinary practice—which in-

cludes many involuntary patients given his long tenure with BOP—he also spoke to his observations about how patients have responded to anti-psychotic medications during his 22 years of practice. Resistance to treatment does not impact the efficacy of anti-psychotic medication. (September hearing Tr. at 12–13.) Therefore, Dr. Berger's observations are not only germane but precisely the type of expert knowledge he was called to provide..

cross examination. Both during the hearing and in post-hearing briefing, the defense challenged the evidentiary sufficiency of Dr. Berger's opinion on the basis that it did not establish a numeric probability of success.[6] Emphasizing that the government could not point to a study of the efficacy of a second anti-psychotic, a shortcoming which Dr. Berger acknowledged on direct examination, Decoteau attacked the reliability of Dr. Berger's assessment.[7] (September hearing Tr. at 7, 11–16.) Sharpening the focus, Decoteau questioned whether Dr. Berger's clinical judgment drew too heavily on his experience with patients voluntarily taking anti-psychotic medication. *Id.* But this line of questioning ultimately revealed that the medications have identical efficacy in the two groups. (September hearing Tr. at 12–13.)

### Discussion

■ As discussed in more detail in *Decoteau I*, the government can be authorized to involuntarily medicate a criminal defendant to restore competency if "(1) there are important government interests in trying the individual; (2) the treatment will significantly further those interests; (3) the treatment is necessary to further those interests, considering any less intrusive alternatives; and (4) the treatment is medically appropriate." *United States v. Magassouba*, 544 F.3d 387, 396 (2d Cir. 2008) (*citing Sell*, 539 U.S. at 180–81, 123 S.Ct. 2174). Decoteau effectively challenges only the second *Sell* requirement on the instant application. Moreover, as the Court indicated at the hearing on that application (to continue to forcibly medicate), the record, findings, and holdings of *Decoteau I* are incorporated by reference.

■ As recognized in *Decoteau I*, it is well settled in the Second Circuit that, to prove the significant interest requirement of *Sell*, the government must demonstrate that the proposed treatment "(1) is 'substantially likely' to restore the defendant to competence while (2) being 'substantially unlikely' to cause side effects that will interfere significantly with the defendant's

---

**6.** Although the government need not establish a precise numeric probability, the Court notes that Dr. Berger's testimony implies a prognostic range of between 51 % and 73% likelihood of restoring Decoteau to competence. (September hearing Tr. at 19, 35–36 ("[A] second type of medication is generally more successful than not;" "[T]he numerous studies specifically [sic] to the delusional disorder shows about 73 percent chance of the person being restored to competency with medication treatment ... I still think it is less likely now that he has had one failure...."). If a precise numeric probability could be ascribed, which Dr. Berger opined it could not, (September hearing Tr. at 19, 34), it would fall in that range. The resulting spectrum is at least as illustrative as the probability established in *Bedros*. There, the government's expert predicted that the prescribed medication had a 60% chance of rendering the defendant competent to stand trial. *United States v. Bedros*, 2008 WL 2437865 at *2 (E.D.N.Y.2008). However, when asked on cross examination "whether 'it's possible that the ability to actually affect Mr. Bedros competence [sic] could be much lower than 60 percent,'" the expert replied that it was. *Id.* Recognizing explicitly that the expert "acknowledges that it could be less" than 60%, the court found "based upon [the expert's] testimony ... that treatment is substantially likely to restore Bedros to competence." *Id.*

**7.** In addition to questioning the basis of Dr. Berger's opinion, Decoteau also attempted to undermine the government's estimate by, in essence, providing two of his own. Dr. Berger refuted the first—a less than 50% chance of success extrapolated erroneously from the Cochrane study—at the September hearing. (September hearing Tr. at 25–29.) The second estimate—a less than 15% chance of competency restoration—presented in defendant's post-hearing brief, to which the government did not respond, suffers similar shortcomings to the extent that it glosses over distinctions in the data. (Def.'s Post-hearing Br. at 1–2.)

ability to assist in his defense." *Decoteau I*, 857 F.Supp.2d at 304 (*citing United States v. Gomes*, 387 F.3d 157, 161 (2d Cir.2004)). Decoteau has not asked the Court to reopen the issue of side effects. (*See* September hearing Tr. at 45.) Rather, defendant claims that the government has not met its burden in proving a substantial likelihood of success.

As the Court described in *Decoteau I*, "[n]o controlling case law defines 'substantially likely' with precision." *Decoteau I*, 857 F.Supp.2d at 304. In the absence of a bright line test, the Court looks to *Gomes* as a starting point. There, the Second Circuit upheld an order authorizing forcible medication of an incompetent defendant suffering from delusional disorder. *United States v. Gomes*, 387 F.3d at 159–63. The Second Circuit explained:

> the district court chiefly relied on the testimony of [two BOP mental health professionals] to find a substantial likelihood that [defendant's] competency could be restored through chemical treatment. The doctors noted a "substantial probability" that anti-psychotic medication would render him competent.

*Id.* at 161. The similarities between the key element of proof in *Gomes*—creditable expert testimony—and the expert opinion in the instant case are striking. Like in *Gomes*, at the September hearing, the government called to the stand an experienced BOP professional with direct knowledge of defendant's condition. Dr. Berger, like the BOP psychiatrist in *Gomes*, drew on his experience treating patients with psychotic disorders to formulate his opinion. See September hearing Tr. at 19 ("I generally have the impression, but as a clinician over time that a second medication is generally successful more often than not."); *United States v. Gomes*, 305 F.Supp.2d 158, 165–66 (D.Conn.2004) (*aff'd* by *Gomes*, 387 F.3d 157) ("It has been Dr. Sarrazin's experience that treatment with atypical anti-psychotic medication has improved psychotic disorders....") And here, as in *Gomes*, Dr. Berger opined unequivocally that there was a "substantial probability" that the proposed course of medication would restore the defendant to competence. (*Eg.*, September hearing Tr. at 36–37.) When asked by the Court whether "in your professional opinion to a reasonable degree of certainty, that notwithstanding the Risperdal treatment, that a fresh round of treatment with Haldol still presents a substantial likelihood of success?" Dr. Berger replied, "[f]rom a clinical perspective, I would go ahead and do it, thinking it was a substantial probability." [8] *Id.* Plainly, the government presented expert evidence that is at least as strong as the evidence found sufficient in *Gomes*.

The *Sell* inquiry, however, does not end with this finding. Recognizing importantly that the district court in *Gomes* "chiefly relied" on the testimony of the BOP experts to satisfy the *Sell* requirement that the proposed involuntary medication was substantially likely to restore the subject defendant to competency, the Second Circuit noted that the district court found secondary support in "the BOP's 70 percent success rate in restoring defendants to competence through treatment."

---

**8.** Dr. Berger went on to note that he is not an attorney, nor a judge, and therefore was not rendering a judicial opinion. Upon further questioning, he clarified that, if asked as a doctor, he would say that the proposed treatment would have a medically substantial probability of success. (September hearing Tr. at 36–37). The Court weights his medical opinion particularly heavily because, according to the Cochrane study, medical and judicial findings with regard to competency restoration correlate in 96% of cases. (Cochrane study at 7.)

*Gomes,* 387 F.3d at 161–62. The highlighted statistic covered BOP's success rate "treating defendants with psychotic disorders *similar* to [the defendant's]." *Gomes,* 305 F.Supp.2d at 165 (emphasis added); *see also United States v. Bedros,* 2008 WL 2437865 (E.D.N.Y.2008) (holding that the government proved with clear and convincing evidence that there was a substantial likelihood involuntary medication would restore the subject defendant to competence based on testimony of an expert, who incorporated two studies into his estimate that defendant had at most a 60% chance of recovery but noted that the studies did not address patients with the precise disorder suffered by defendant). The statistic did not, therefore, reflect directly the probability of restoring to competence a person suffering the defendant's *particular* malady. Keeping the secondary significance of the studies in perspective, the statistics they produce do not establish a standard for "substantial likelihood" but merely provide a useful yet inexact guidepost for evaluating the expert testimony that is actually offered about an incompetent subject defendant.[9] The Herbel and Cochrane studies serve such a purpose in the instant case. Even though the studies show, respectively, a 77 and 73% success rate among a population of incompetent defendants suffering the same type of disorder as Decoteau, neither demonstrates specifically the efficacy rate of a second anti-psychotic when the first is terminated early for lack of response as in Decoteau's case, that is, terminated even before the average time for anti-psychotic treatment is reached. The studies, nonetheless, remain instructive but simply not conclusive either way with respect to renewal of the authorization to involuntarily treat such a defendant. Direct empirical data on this narrow question would be preferable obviously, but such data is not available. (September hearing Tr. at 11.) It is, however, not, as Decoteau argues, necessary. (September hearing Tr. at 42, 48, 50.) In step with *Gomes,* the expert testimony in the record, discussed above, more than suffices. It is clear and convincing proof that there is a substantial likelihood that renewed involuntary medication of Decoteau with a different anti-psychotic medication will restore his competency without inflicting any significant or detrimental side effects.

Lastly, the Court must determine for how long to extend the period of forcible medication. Other than a two week extension designed to do no more than complete the trial of Risperdal, (Def.'s Resp. at 2), which the government has already conceded would fail, defendant adheres to its view that no extension whatsoever is supported by the evidence. The defense places all of its eggs in the broken basket carrying the argument that the government has failed to establish through Dr. Berger's testimony at the initial and continued hearings a substantial likelihood that a second round of chemical treatment would restore Decoteau to a level of competency sufficient to enable him to assist in his own defense. With the defense objection rejected by the Court, Dr. Berger's expert recommendation as to the course of treatment and the period of time needed to implement it are unchallenged. According

---

9. The Court notes that some courts have extended involuntary medical treatment on the basis of expert testimony alone, without discussion of empirical probabilities. *See United States v. Payne,* 539 F.3d 505 (6th Cir.2008) (granting government's motion to extend involuntary medication and change defendant's course of treatment to include other anti-psychotic drugs as well as haloperidol); *United States v. Weston,* 326 F.Supp.2d 64 (D.D.C. 2004) (permitting government to continue medicating a defendant who was improving but had not yet achieved competence during the initial course of involuntary medication).

to Dr. Berger's recommendation, a second round of treatment with Haldol or a similar alternative drug for the length of time it authorized for the initial course of Risperdal treatment is minimally required. (September hearing Tr. at 4–7, 32.) Moreover, it is noted that, even added together, though it appears the Risperdal treatment will have no effect either way on the efficacy of the second trial, (September hearing Tr. at 8–9), a second authorization will bring the actual treatment time to about eight months. This cumulative period is in harmony with the practices reflected in the Cochrane study, which shows that some of the study's subjects required a treatment period of over one year. (Cochrane study at 7.) The Court therefore authorizes a responsible course of medication, in line with Dr. Berger's recommendation, of four months duration designed to minimize Decoteau's risk of side effects.[10]

### Conclusion

After considering the entire record, the Court finds the government has proven each of the *Sell* factors by clear and convincing evidence. Its motion for renewed authorization to medicate defendant involuntarily, if necessary, to restore his competency to stand trial is granted.

The Court, therefore, orders, pursuant to 18 U.S.C. § 4241(d)(2)(A), that defendant shall remain in the custody of the Attorney General at FMC Butner for further treatment to restore him to competency to proceed to trial. Defendant may be involuntarily medicated to restore his competency if defendant does not voluntarily accept medication, all in accordance with Dr. Berger's proposed treatment plan. In addition, the staff at Butner may

perform involuntary physical and laboratory assessments and monitoring that are clinically indicated, if defendant does not voluntarily submit to such assessments and monitoring. The ordered period of treatment shall be four months from its commencement, which may be extended upon court approval.

Decoteau's treating doctors shall file monthly progress reports with the Court during the treatment period, with the fourth report being filed at least three weeks before the end of the four month period concurrently with any request to extend the period. If there is a change in relevant circumstances, including changes in Decoteau's medical condition, defendant or the government may move at any time to amend this order. If Decoteau is restored to competence, a report shall be filed with the Court discussing the results of the treatment, whether and how the medications will affect Decoteau at trial, and how to monitor for effects of the treatment throughout trial. If, on the other hand, it is determined that the treatment has failed, the government shall file a report so advising the Court and assessing defendant's current mental and physical condition.

Finally, leave is granted to file an interlocutory appeal within 14 days of the entry of this order, which, except for the order that Decoteau remain at FMC Butner, is stayed pending possible appeal. *Sell*, 539 U.S. at 176, 123 S.Ct. 2174 (holding forced medication orders are immediately appealable). Unless the order is further stayed, the second round of treatment of defendant with anti-psychotic medication shall

---

**10.** The Court notes that granting a shorter extension, would incentivize BOP to follow the most aggressive course, with regard to drug and dosage selection, that *Sell* permits, rather than the minimalist approach BOP has followed here. In any event, such an attenuated authorization would be at odds with Dr. Berger's expert opinion, which, at bottom, is what supports the continued authorization in the first place.

commence on or around November 15, 2012.

SO ORDERED.